# EXHIBIT A

EXHIBIT A

Daniel T. Doria
989 S Main St Ste A PMB 407
Cottonwood, AZ 86326
702-279-5326
danieldoria105@yahoo.com

SUPERIOR COURT
YAVAPAI COUNTY, ARIZONA

2025 DEC -1  PM 1:58

DONNA McQUALITY, CLERK

BY: J. Mendez

## SUPERIOR COURT OF ARIZONA IN AND FOR THE COUNTY OF YAVAPAI

DANIEL T. DORIA,

Plaintiff

v.

COTTONWOOD SPRINGS RV LLC

Defendant.

Case No.: S1300CV 202580488

VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT, BREACH OF CONTRACT, AND PERMANENT INJUNCTION

(Jury Trial Demanded)

## I. JURISDICTION AND VENUE

1. Jurisdiction: This Court has jurisdiction pursuant to A.R.S. § 12-123 and A.R.S. § 12-1831. Plaintiff seeks declaratory and injunctive relief involving the determination of property rights and statutory interpretation under the *Arizona Recreational Vehicle Long-Term Rental Space Act.*

2. Basis for Superior Court Venue: Plaintiff files this action in Superior Court to seek equitable relief (Declaratory Judgment and Injunction) to prevent the deprivation of statutory rights. The local Justice Courts have historically failed to apply the specific protections of the *RV Act* or claim a lack of jurisdiction to issue injunctive relief against landlords in these matters. Intervention by a court of general jurisdiction is required to uphold the law.

3. Venue: Venue is proper in Yavapai County because the real property that is the subject of this action is located therein.

## II. PARTIES

4. Plaintiff Daniel T. Doria constitutes a "Tenant" of a "Space" as defined by A.R.S. § 33-2102. He resides at Space #177, Cottonwood Springs RV Resort, Cottonwood, AZ.

5. Defendant Cottonwood Springs RV Resort is a "Landlord" as defined by A.R.S. § 33-2102.

6. Defendant Michael Mongoni is the owner of the Resort. Defendant Julie Pendergast is the General Manager of the Resort.

## III. GENERAL ALLEGATIONS

7. Protected Tenancy: Plaintiff has rented Space #177 for a duration exceeding 180 days. As such, Plaintiff is designated a "Long-Term Tenant" protected by the Arizona Recreational Vehicle Long-Term Rental Space Act (A.R.S. Title 33, Chapter 19).

8. The Lease Modification: Plaintiff's lease includes a material modification, signed by the Landlord, expressly permitting Plaintiff to "babysit dogs" at the premises. This provision is valid and in full force.

9. Retaliatory Dispute: In September 2025, Plaintiff asserted his rights under the RV Act regarding lease renewals. In retaliation, Defendants threatened to terminate the tenancy.

10. The Defective Notice: On November 20, 2025, Defendants served an "Immediate Notice to Move" (Attached as Exhibit A).

11. Wrong Statute Cited: The Notice cites A.R.S. § 33-1368(B). This statute governs the *Arizona Residential Landlord and Tenant Act* (standard apartments/houses). It does not apply to RV Space rentals. Defendants are intentionally citing the wrong

statute to bypass the "Good Cause" eviction protections mandated by the *RV Long-Term Rental Space Act* (A.R.S. § 33-2143).

12. False Claim of "Irreparable Breach": Defendants claim "inappropriate communication" and "failure to sign a new lease" constitute an "Irreparable Breach" allowing for immediate eviction. Under Arizona law, these are administrative or conduct issues requiring a "Notice to Cure," not grounds for immediate expulsion.

13. No Agreement to Vacate: The Notice falsely claims Plaintiff "agreed to move out Oct 30th." Plaintiff explicitly denies this. No such agreement was executed, and Defendants waived any such claim by accepting Plaintiff's continued occupancy into November.

14. Anticipatory Refutation of "Harassment": Defendants may attempt to characterize Plaintiff's vigorous written objections to their illegal conduct as "harassment." Plaintiff asserts that valid protests against unlawful eviction and citation of the correct governing statutes do not constitute "harassment" or grounds for termination. Furthermore, on November 20, 2025, parties mutually agreed to cease informal text communication and direct all future correspondence through legal channels.

## IV. CAUSES OF ACTION

COUNT ONE: DECLARATORY JUDGMENT (A.R.S. § 12-1831) 15. A controversy exists regarding the applicable law. Plaintiff requests a Judicial Declaration that: * a. The

tenancy is governed by the RV Long-Term Rental Space Act, not the Residential Act. * b. The "Immediate Notice to Move" dated November 20, 2025, is legally void for citing the wrong statute and lacking "Good Cause." * c. The lease provision permitting dog sitting is valid and enforceable.

COUNT TWO: UNLAWFUL RETALIATION (A.R.S. § 33-2148) 16. Defendants' issuance of the Notice to Move is a direct retaliatory response to Plaintiff's prior complaints regarding the RV Act and refusal to accept a unilateral lease change.

COUNT THREE: BREACH OF CONTRACT 17. By attempting to evict Plaintiff for an activity expressly permitted in the lease (dog sitting), Defendants have breached the express terms of the agreement and the Covenant of Quiet Enjoyment.

V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows: A. A Temporary Restraining Order and Preliminary Injunction enjoining Defendants from filing for eviction, locking Plaintiff out, or interfering with utility services during the pendency of this action. B. A Declaratory Judgment that the Notice of November 20, 2025, is void. C. Statutory damages for retaliation. D. Costs of suit and such other relief as is just.

VERIFICATION

I, Daniel T. Doria, declare under penalty of perjury that the contents of this Verified

Complaint are true and correct to the best of my knowledge and belief.

Dated: November 20, 2025

_____

Daniel T. Doria, Plaintiff Pro Se

Exhibit A

**Notice of Material and Irreparable Breach**
**Immediate Notice to Move**

Daniel T Doria Site 177
420 Happy Jack Way
Cottonwood, AZ 86326

Cottonwood Springs RV
420 Happy Jack Way
Cottonwood, AZ 86326
(928) 649-1878

Tenant(s) Name / Address / Phone

Landlord(s) or Agent's Name / Address / Phone
GM - Julie Pendergast

Notice Date: 11-20-2025

You have violated your rental agreement. **The violation(s) cannot be fixed. Your landlord wants you to move out now and return the keys immediately.** The following is what happened, where it happened and when. Attach additional sheet(s) if needed.

Your signed agreement with Cottonwood Springs RV commenced on June 9th 2025 and our agreement has been month to month, Term #3, cited on page 1, states either party may terminate anytime after the expiration of the initial term. This is our official notice of terminating our agreement due to inappropriate communication with staff and the general manager and not completing a background and new lease agreement as required by the panc.

An eviction action may be or has been filed against you. If an eviction action has been filed, you have the right to appear in court to dispute the eviction action. After a hearing, the judge will decide if you have to move or if you can legally stay in the rental. If a judgment is entered against you, a Writ of Restitution (a court order to have you removed from the rental) may be issued between 12-24 hours from the date a judgment is signed and you may be required to pay damages, attorney fees, and court costs.

11/20/2025
Date

Signature    ☐ Landlord ☑ Agent
General Manager

This notice is served by:
☐ Hand delivery to (name): _____ who is the ☐ tenant ☐ occupant
☐ By certified mail (mail receipt #): _____

This notice is given under A.R.S. § 33-1368(B). The laws about this notice are found in the Arizona Residential Landlord and Tenant Act. For more information on the Act, eviction actions, and your rights, please visit the Forms and Notices (azcourts.gov), Arizona Department of Housing, AZLawHelp.org, or AZCourtHelp.org.

Arizona Supreme Court    Page 1 of 1    AOCEAONAF-122023

* Also, on October 7, 2025, the general manager and on-site manager discussed you were in violation of the pet rules due to babysitting (for money) numerous dogs on the property, which is prohibited. You agreed to move-out oct 30th (end of the month)

# RV SITE RENTAL APPLICATION & AGREEMENT

Please email completed application form to: info@cottonwoodspringsrv.com or drop off at office.
This application is intended for a set term Lease Rental Agreement with CWS.

**Please complete the following for __All Adults__ staying on the site and will be listed on the Rental Agreement:**

1. Applicant Name: Daniel T. Doria    Cell #: 702-279-5326
   Driver's License: T26139287    State Issued: AZ
   Email: danieldoria105@yahoo.com
   Home Address: 420 Happy Jack Way Spc #177
   City: Cottonwood    State: AZ    Zip: 86326

2. Applicant Name: _____    Cell #: _____
   Driver's License: _____    State Issued: _____
   Email: _____
   Home Address: _____
   City: _____    State: _____    Zip: _____

(please attach copy of Driver's License or ID for verification purposes)

Number of adults and children staying on-site on a __regular__ basis: ___1___

List name, age and relationship of __all occupants__ of the recreational vehicle:

Name: Daniel T. Doria    Age: 39    Relationship: Self
Name: _____    Age: _____    Relationship: _____
Name: _____    Age: _____    Relationship: _____

**Rental History:**

Park Name or Current Landlord: _____
Address of Currently Renting: _____
City: _____    State: _____    Zip: _____
Telephone # of Park or Landlord: _____
Date Moved In: _____    Date Moved Out: _____
Reason for Moving: _____
Park Name or Previous Landlord: _____
Address of Previous Location: _____
City: _____    State: _____    Zip: _____
Telephone # of Park or Landlord: _____
Date Moved In: _____    Date Moved Out: _____
Reason for Moving: _____

Has either Primary Guest or any Other Occupant(s) (listed above) ever (check if applicable):

___ Been evicted or asked to move out?

___ Broken a rental agreement or lease contract?

PAGE 1

___ Been or are currently delinquent to a previous landlord?

___ A registered sex offender?

___ Been convicted of a Felony?

If any checked, please explain. _____

_____

**Employment Information:**

For Applicant Name 1: Company Name of Current Employer: Universal Canine HealthCare

Address of Employer: 9B95 S Main St SteA PMB 407

City: Cottonwood   State: AZ   Zip: B6326   Phone #: 728-362-1168

Current Position: Director   Start Date: 2022

For Applicant Name 2: Company Name of Current Employer: _____

Address of Employer: _____

City: _____ State: _____ Zip: _____ Phone #: _____

Current Position: _____ Start Date: _____

If not currently employed, please explain income resources (i.e, retired, social security, etc.): _____

Verification of income may be required by management.

**Vehicles: Lessee represents that he/she is the registered and/or legal owner of the following recreational vehicle or mobile recreational vehicle (hereinafter all general referred to as "RV").**

Year: 1999   Make: Fleetwood   Model: Prowler   Length: 25

Vehicle ID No.: 1EC1H2620X1577403

RV License Plate: T7AUFB   State: AZ

Lessee's Liability Insurance Carrier: _____

Lessee's Liability Insurance Carrier Policy No: _____

Agents Name: _____ Agent's Telephone No: _____

**Please provide a copy of the insurance declaration page to the office.**

Slide out(s)? Yes X or No___ If yes, how many: 1

Recent photo of RV must be submitted. RV must be under 10 years old, or management approval will be required ✓

**Other Vehicles:**

Make/Model of Vehicle: Toyota Prius   Year: 2012 State/Plate #: AZ/DCA37V

Make/Model of Vehicle: _____ Year: _____ State/Plate #: _____

**References: (Rental or Professional References. Family/Friends Not Accepted)**

1. Name: Kadeem O'Berry   Cell #: 917-873-2899
   Email _____ Relationship Solar Industry Peer

2. Name: Brandon Douglas   Cell #: 905-962-8228
   Email _____ Relationship Business Partner

**Emergency:**

In case of emergency, notify:

Name: David Doria        Phone: 707-567-6580   Relationship: Brother

**Pets:**

Will a pet be staying on the site: Yes X or No___. Number of pets: 2 + Petsitting If yes, please list the type, breed, and weight of all pets: Sam 16 yrs old 35 LB Golda Cocker

Tima 14 yrs old 12 LBS Chi-Pom-Pom

I authorize the Cottonwood Springs RV Resort ("CWS") and their agents, including any collection authority, to obtain further address and employment information, and any necessary background screening information before, during and after the lease term for the purposes of collecting past due lease payments, late fees or any other charges that are owed to CWS. I hereby authorize a credit and/or criminal check to be made, verification of information I provided and communication with any and all names listed on this application. I understand this is an application to rent an RV space and does not constitute a rental or lease agreement in whole or part.

The undersigned Primary Guest, and all Adult Other Occupants represent that all of the above information is true and complete and authorize the verification of same by any means. Primary Guest and all Adult Other Occupants acknowledge that an investigative consumer report including information as to the character, general reputation, mode of living, whichever is applicable, may be made. Anyone on which a consumer report is made has the right to request additional disclosures and a written summary of the rights of a consumer under the Fair Credit Reporting Act. False information given shall entitle RV Park to: (1) reject this application; (2) retain the deposit in accordance with the site rental agreement; and (3) terminate Primary Guest's right of occupancy in accordance with the site rental agreement. False information may also constitute a serious criminal offense under the laws of this State.

Applicant Name 1:

Signature: _____

Printed Name: Daniel T. Doria

Date: 3-10-25

Applicant Name 2:

Signature: _____

Printed Name: _____

Date: _____

Cottonwood Springs RV Resort

Signature: _____

Printed Name: Marina Hankins

Title: Property Manager

Date: 3/10/25

----------------------For Internal Use Only----------------------

Obtained copy(ies) of IDs ☑          Application Fee Collected ☐
Obtained pictures of RV/Trailer ☑    Over 10 Years Approved ☐
Contacted Current/Previous Landlord(s) ☐   Contacted References ☐
Obtained Background ☐                Contact Employer/Income Verified ☐
Notes: _____

Person verifying information: _____   Date: _____

PAGE 3

The rules and regulations listed below apply to those who stay in this park on a Monthly and beyond basis and are in addition to the rules stated in the park's standard brochure. Our max space rental agreement is 3 months. You may extend your stay by notifying the office at least 30 days prior to your current agreement expiring. A new lease agreement must be signed 30 days prior to ensuring your current RV site.

1.  This Space Rental Agreement (hereinafter referred to as "Agreement") is made and entered into for a term beginning on this __10th__ day of __March__, 20__25__ (the "Effective Date") by and between Cottonwood Springs RV Resort (hereinafter referred to as "Lessor") and __Daniel T. Doria__ and __no other__ (hereinafter referred to as "Lessee").

2.  RV SITE: Lessor hereby leases to Lessee the following RV site number: __177__ (the "Site") of Cottonwood Springs RV Resort property. Lessor has the right upon twenty-four (24) hours' notice to relocate Lessee to a substantially equivalent site on the property.

3.  TERM: The term of this Agreement shall commence on the date written above in paragraph 1, effective date and end on: __9th__ day of __June__, 20__25__ (the "Initial Term"). Unless terminated by either party, after the expiration of the Initial Term, this Agreement shall automatically continue to a currently monthly rate basis. Note Rate is subject to change from the initial rental agreement amount.

4.  RENTAL RATE: Lessee(s) shall pay per month $ __499⁰⁰__ plus electric, billed at: $.145 per KWH (see paragraph 6). Rent is due on or before the 1st of every calendar month. If rent is not received before the 5th of the month, a late fee will be added at $15 per day until rent is paid in full. Rent shall be paid at the park's office by credit card, check, money order or cash during business office opening hours. If Lessor must give notice to terminate the Agreement for nonpayment of rent. Lessor shall not be deemed to have waived any right to terminate by accepting partial rent for the period involved. If Lessor gives notice to terminate this Agreement for any other reason, Lessor does not waive the right to terminate by accepting rent prorated to the termination date specified in the notice. A $50.00 penalty shall be charged for all returned checks/credit cards. The monthly rent is not refundable when the Lessee leaves at any time before the final day of the month or prepaid term.

5.  ELECTRIC UTILITY: Lessee shall pay Lessor, in accordance with the schedule for payment of the rate checked in Paragraph 5, above, all electrical power charges used by Lessee in connection with the use of the RV Site. This amount is based on $.145 per kWh and is calculated by Lessor. Lessee is only allowed to use the power box signed to the rented site. Lessee is not allowed to use any other power boxes on the premises. Power boxes must not be tampered with in any way. If power boxes show tampering, the Lessee will be charged for the repairs, and the Agreement will be terminated immediately. The beginning meter reading as of the Effective Date of this Agreement is __2301kwH__

6.  SECURITY DEPOSIT: Lessee shall pay the amount of $ __0__ _Promotion_ for a security deposit, paid on _____ which shall be refunded upon termination of the Lessee's tenancy in the park to the extent that the amount is not necessary to remedy the Lessee's default in the performance of this Agreement and/or to repair damages to the space or park caused by the Lessee, not including ordinary wear. The Lessee's RV damages caused by natural disaster (flood, earthquake, drought, strong wind, etc.), and theft shall be covered by the Lessee's own RV insurance. If the Lessee is in good standing with account and a written 30-day notice, the security deposit may be used for the last month's rent. Any fees, like electricity or other fees, or outstanding balance will still be due for that last month prior to end of lease.

7.  PETS: Pets are welcome with responsible pet owners. Up to two (2) pets are allowed (unless approved by management). All pets must be on a leash when outside the RV. Lessee must have proof of their pet's vaccinations available. Pet owners must clean up after their pets including all pet excrement. Do not allow your pet to use any RV site as a bathroom. Noisy, destructive, aggressive, unleashed, or dangerous pets will be cause for immediate eviction. Lessee is liable for any damage or injury caused by his or her pet. No pet shall be allowed to run loose in the park and no pet shall be left tied outside, unattended by Lessee. Pets must be kept off other people's RV spaces. Birds, rodents, and reptiles must be always kept in RV and in a cage. Describe pet(s):

_____

Lessee(s) Initials: __DTD__                                                                                              P a g e | 1

8.  CREDIT/DEBIT CARD ON FILE: Lessee is to provide Lessor with information for a valid credit card to be kept on file. The credit card information will be used by Lessor to initiate payment for situations arising from the following:

a)  Any damage, or cleaning / repairing of the RV Site caused by Lessee and, or, their guests, or invitees.

b)  If Lessee vacates the RV site without paying Lessor, the total amount due under this Agreement. Final electric bill and any outstanding balance upon checking out, Lessee will be charged the total amount owed on the card.

*If Lessor uses the credit card information for the reasons described above, Lessor will provide Lessee with a statement of account, listing the charges. In the event of reversal and/or denial of legitimate charges by Lessee, a fee of $100.00 plus attorney fees will be charged. Lessee agrees to update Credit/Debit Card on File with any changes to the card with the office.

9.  RULES AND REGULATIONS: Lessee and their guests, invitees and all occupants shall comply with the written rules and regulations provided to Lessee. Lessee agrees to comply with all state and federal laws, rules, ordinances, and regulations applicable to Lessor's property. See Addendum B: Park Rules and Regulations.

10.  RENTING OR SUBLETTING: Lessee shall not sublease or otherwise rent all or any portion of Lessee recreational vehicle or the premises. Lessee shall not assign or encumber his or her interest in this Rental Agreement or the premises. No consent to any assignment, encumbrance, sublease or other renting shall constitute a further waiver of the provisions of the paragraph. The only parties allowed to stay in the RV in this park are those specifically named herein. No other people may reside in the RV without the written permission from Lessor.

11.  TERMINATION OF AGREEMENT: This Agreement may be terminated by either party upon giving a 30-day notice in writing. Lessor reserves the right to terminate this Agreement with a shorter period of notice if allowed by law. If state or local laws require an RV to be moved from the park for any reason, this Agreement will automatically terminate, and the notice time may be shorter. This Section supplements Section 4 of this Agreement; this Agreement terminates on the earliest termination dates specified in Section 4 or on the termination date established or allowed by this section.

12.  DEFAULT BY LESSEE: The following acts constitute defaults by Lessee ("Acts of Default"):

a)  Failing to timely pay the Rental Rate, outlined in Paragraph 5, above, or other lawful charges when due under this Agreement

b)  Giving false information to Lessee, Lessee's guests and/or occupants failing to comply with this Agreement, such as violating provisions of this Agreement or committing serious misconduct or criminal acts

c)  Remaining on the Property after giving notice of termination and intent to vacate; and/or

d)  Remaining on the Property after Lessor gave notice of termination at the end of the term or an Agreement Termination Notice, outlined in Paragraph 12, above.

13.  TOWING POLICY: Non-payment of site rent or services and or violations of rules can result in vehicles/RVs being towed and impounded at the owner's expense. A 24-hour towing/impound notice will be posted on any and all vehicles to be removed.

14.  ENTRY UPON RESIDENT'S SPACE: The Lessor shall have a right of entry upon the land on which a recreational vehicle is situated for maintenance of utilities, maintenance of premises if the occupant fails to do so, and the protection of the park at any reasonable time. However, such an entry shall not be in a manner at a time which would interfere with Lessee's quiet enjoyment. The Lessor may enter a recreational vehicle without the prior written consent of the occupant in the case of an emergency or when the occupant has abandoned the recreational vehicle.

15.  LESSEE'S RESPONSIBILITIES:

a)  Lessee shall be responsible for all damage caused by Lessee or any of Lessee's guests or visitors.

b)  Lessee agrees to obey all park rules and regulations contained in this Agreement, posted or distributed.

Lessee(s) Initials: DTD

c)  Lessee acknowledges the space is to be used only by Lessee for private residential or recreational purposes and shall be used by no other persons except those people listed in this Agreement. No business or commercial activity of any nature shall be conducted in this park. Lessee agrees to immediately deliver possession of the space rented hereunder upon the expiration on the term of this Agreement.

d)  Lessee acknowledges and agrees that Lessor shall have no responsibility for Lessee's safety or the safety or protection of any of Lessee's possessions. Lessee acknowledges that the park entrance is not guarded or patrolled, and that Lessee is responsible for locking his/her RV in order to help prevent loss or damage. Lessee agrees to notify Lessor and/or the police in the event Lessee observes or learns of suspicious or illegal acts within the park.

e)  Lessee agrees that at the end of the term of this Agreement Lessee shall move the RV out of the park and shall have no right to leave it or sell it to be left in the park. If someone buys the RV, the buyer must move it immediately.

f)  Lessee acknowledges and agrees that the RV site is in good condition and is adequate for Lessee's use. Upon termination or expiration of this Agreement, Lessee agrees to surrender the RV site to Lessor in a similar, good condition. If Lessee fails to leave the RV site in good condition, Lessor will assess reasonable charges to Lessee for returning the RV site to good condition.

g)  Lessee agrees to hold harmless and indemnify Happy Jack Lodge dba Cottonwood Springs RV Resort, its members, and employees of all liabilities for loss or damage of property or injury of person or persons or animals arising from the use of Cottonwood Springs RV Resort property.

h)  Lessee is responsible for carrying and providing proof of insurance for all vehicles and RV.

16. LEGAL REMEDIES, PROVISIONS AND GOVERNING LAW:

a)  Lessor agrees that any notice of nonpayment of rent or termination of tenancy shall be deemed served on the day on which it is attached in a secure manner to the main entrance of the RV and, if required by law, mailed to Lessee.

b)  If written notice is required by law to terminate this rental Agreement, the tenancy shall terminate of the day designated in the Notice of Termination without regard to the expiration of the period for which rent is to be paid.

c)  In the event Lessee breaches this Agreement, Lessor shall have available to Lessor all remedies provided at law or in equity.

d)  If any action is required to enforce or interpret this Agreement, then the prevailing party shall be awarded reasonable cost and attorney fee from the losing party.

e)  If Lessee abandons the RV described herein, or any other personal property, Lessor may sell or dispose of said RV or other personal property, as permitted under Arizona law. Lessee shall pay, upon demand, all costs and expenses incurred by Lessor in the moving or storing of Lessee's RV or personal possessions, plus court costs and attorney fees incurred in selling or otherwise disposing of the personal property and/or RV abandoned by the Lessee.

f)  If any provision of this Agreement is held to be invalid, illegal or unenforceable then that provision shall not affect the validity, legality, or enforceability of the other provisions herein, then the parties agree that the remainder of this Agreement shall remain in forced and affect. Lessee shall not seek recovery of damages from Lessor for attempting to enforce such provision, rule, regulation or policy in good faith prior to receiving notice of its invalidity or illegality.

g)  No delay or omission in the exercise of any right or remedy of Lessor following the event of default by Lessee shall impair any such right or remedy or be construed as a waiver. No waiver by Lessor of Lessor's rights to enforce any provision hereof after any default on the part of Lessee shall be effective unless made in writing and signed by Lessor, nor shall it be deemed a waiver of Lessor's right to enforce each and every other provision hereof upon further or other default on the part of Lessee. Lessee understands that if Lessor fails to enforce any term of this Agreement, Lessor is still entitled to enforce the Agreement on any subsequent occasion. Acceptance of rent shall not be, or construed to be, a waiver of any breach of any term or provision of this Agreement, nor shall it reinstate, constitute or extend the term of the Agreement or affect any notice, demand or suit hereunder.

Lessee(s) initials: _____

h)  This Agreement constitutes the product of negotiations of the parties hereto and any enforcement hereof will be interpreted in a neutral manner and not more strongly for or against and party based upon the source of the draftsmanship hereof.

i)  This Agreement constitutes the entire agreement between and among the parties, interpreted all of the terms and conditions mentioned herein or incidental hereto, and supersedes all negotiations or previous agreements between the parties or their predecessor in interest with respect to all or any part of this suspect matter hereof.

j)  Lessee agrees they will not post any negative social media without first giving the Lessor the time to remedy Lessee complaints in writing. Such postings that may result in any damages or fees will be paid by the Lessee to the Lessor.

k)  If Lessee or guests of the Lessee must be trespassed for any reason: A trespasser is defined as someone who knowingly enters or remains unlawfully on another person's property without permission or legal authorization to do so. Trespassing can include entering private property, hopping a fence, entering a building or structure, or remaining on the property after being asked by the owner to leave. According to Arizona Revised Statutes (A.R.S.) 13-1502, criminal trespass in the third degree. Knowingly entering or remaining unlawfully on any real property after a reasonable request to leave has been made by the Lessor, property owner, a law enforcement officer or anyone with lawful control over the property, or if the property had a notice posted that prohibited entry. If we ask you to leave, you must vacate the property. We will prosecute any violations under the criminal trespass statute. This will also constitute as immediate termination of this Agreement.

l)  Criminal activity: See Addendum A

TERMS: Lessee certifies that the included printed material beginning on page 1 through page 9 (including Addendum A and Addendum B) of this Agreement has been read and the terms and conditions set forth herein are understood. Lessee further certifies that he/she has examined the space in which the subject RV is to be placed and finds it suitable and acceptable. Lessee acknowledges has also read and will comply with the Park Rules and Regulations (see Addendum B).

Lessee also acknowledges receipt of an executed copy of this Agreement including Addendums A and B.

Lessee certifies that the above information is correct and complete.

Lessee understands that if any of this information is later found to be false, it may be grounds for eviction and termination of this agreement.

Lessee authorizes the park management to conduct any credit checks or other inquiries necessary for verification of this information before or during this Agreement term.

Lessee understands that the park management has the right of refusal upon the arrival of the RV described in this application.

Lessee(s) Initials: DTD

Additional acknowledgement(s):

To contact the onsite manager:  Manager@cottonwoodspringsrv.com

To contact the General Manager: GMLLC@happyjacklodge.com

Lessee: _____

Signature

Date: ___3-10-25___

Lessee: _____

Signature

Date: _____

Lessor: <u>Cottonwood Springs RV Resort</u>

Agent's Signature

Agent's Printed Name

Date: 3|10|25

Lessee(s) Initials: _DTD_

**Addendum A: Zero Tolerance for Criminal Activity**

**Leased Premises: Cottonwood Springs RV Resort**
**420 Happy Jack Way, Cottonwood AZ. 86326**

This Lease Addendum is incorporated into and made a part of the Agreement executed by the Lessor and the Lessee referring to and incorporating the Leased Premises.

The Lessor has zero tolerance for criminal activity in or around the Leased Premises.

This policy applies to all Lessee(s), occupants, guests, and any visitors in or around the Leased Premises. The Lessor/property manager/or agent will immediately report any evidence of criminal activity to the proper authorities, and the Lessee(s) engagement in any criminal activity is a breach of the Agreement.

The Lessee understands his/her responsibility to call the police/emergency services and report any suspicious activity observed and then notify the Lessor and/or office immediately.

The Lessee(s) understands that disturbances of the peace not only infringe on the neighbors' peaceful enjoyment of their property is a breach of the Agreement.

In the event of any criminal activity in which the Lessee(s) is directly or indirectly involved, the Lessor will take the legal measures necessary to evict the Lessee(s) from the Leased Premises. This includes but is not limited to illegal drug activity, gang involvement, organized crime and disturbances of the peace.

The Lessee(s) understand that violation of this addendum is a breach of the Agreement and will result in the Lessor taking the necessary steps towards the eviction of the Lessee(s). The Lessee(s) may then be responsible for the rent remaining due for the balance of the Lease term, court costs, attorney fees, and other charges in accordance with all applicable Arizona local laws and regulations.

Lessee Signature: _____ Date: 3-10-25

Lessee Signature: _____ Date: _____

Lessee(s) Initials: DTD

**Addendum B: Park Rules & Regulations**

**RV and Site Appearance:**

1. Your RV must be in good repair, good physical appearance, legal/licensed, roadworthy and be certified by RVIA or RPTIA. You must be able to move your RV at any time with no expectation of prior notice. Management has complete discretion as to whether your RV meets these guidelines. If the RV is over ten years old, the Management must approve prior to move-in or change in RV listed on the original lease agreement.

2. Pop-up trailers, pick-up campers, horse trailers, and tents are not permitted.

3. Window A/C units are not allowed unless approved by management.

4. Sleeping outside the RV is not allowed.

5. A sewer hose "donut" or "L" connector is required.

6. Washing of RV or vehicles is not permitted unless you hire a mobile detailer that is fully equipped and self-contained with water. The company must be approved through management before conducting work on property.

7. Portable gazebos and canopies require management approval before being set up.

8. Portable satellite dishes or internet are allowed but must be placed within the rented site and secured. Lessor is not responsible for any damage that may occur to the satellite. Satellite dishes or internet devices may not be mounted to any to anything belonging to the park, such as rocks, trees, site electrical poles, pavement or anything affixed to the property.

9. Construction of decks, sheds or any other structures require written approval from management.

10. You may not alter the appearance of the site without prior written approval from management. This includes the addition of plants, gravel or steppingstones. Planters are allowed on hard surfaces only and must be well maintained.

11. RV skirting must be vinyl snap on type specifically designed for an RV and approved by management.

12. Off the ground fire bowls/pits are allowed but must have a spark arresting cover. Do not leave your fire unattended. Fire must be completely extinguished after each use. You are responsible for emptying ashes in the designated area. Please see management for location.

13. No outside appliances are permitted on your site. Please keep outside storage to a minimum. Periodically, you may be asked to pick-up your site.

14. Holiday decorations are allowed and even encouraged. Decorations must be contained on your site and Management has complete discretion as to whether your decorations are appropriate. Please be considerate of your neighbors when decorating and turn them off at quiet hours.

15. A dumpster will be made available. NO mattresses, large items, electronics or hazardous materials (paint, oil, etc.) are allowed.

16. Please put trash in designated dumpsters. Do not leave trash outside when the dumpster is full. Either use one of the other dumpsters on property that is not full or wait until dumpsters are empty to dispose of your trash.

16. Keep your space free of litter, including cigarette butts.

17. Ensure you do not leave any food or trash outside your RV to not entice animals to enter the park looking for food.

18. Each site is designated for only one RV.

19. RVs are to be lined up next to the water/sewer/electrical panel, where your door will open on the opposite side. At no time can the RV be parked another way resulting water/sewer/electrical hoses be run under the RV and across site to accommodate parking on incorrect side of the site.

20. DARK SKY COMMUNITY - Lighting around the perimeter of your RV is allowed. Lighting on the ground or around the bottom of the RV has no time restrictions. However, any lighting on RV or above the bottom of the RV must be turned off by 10 pm, except for illumination for walkways, roadways, parking areas, and outdoor security as detailed by Yavapai County Law Enforcement.

21. Site markers may not be moved or changed.

Lessee(s) Initials: DTD

**Vehicles:**

1. The Speed limit is 5MPH. Speed limit will be enforced. Fines may be charged for speeding. Habitual speeding may constitute in termination of Agreement.
2. You are allowed to have your RV and up to two (2) vehicles and must be parked within the rented spot.
3. Offsite storage is required for boats, flatbed trailers, car dollies, etc. Please contact the office for more information on storage options.
4. To maintain a pleasant looking community, we ask that any broken down, or "work in progress" cars be removed from the community. Lessee will have 24 hours to remove it, or Lessor reserves the right to have it towed at Lessee's expense.
5. No mechanical work (changing oil, etc.) is allowed.
6. No parking on any empty site, without prior written consent from management.
7. No parking on the roadways at ANY time.
8. Vehicles must be parked within your site and cannot block another site.

**Pets:**

**IMPORTANT: Please beware that coyotes, snakes and birds of prey could be in our area and could potentially pose a threat to your pet. DO NOT leave them outside unattended.**

1. Extended stay guests are allowed a total of two (2) pets.
2. Birds, rodents, and reptiles must be always kept in your RV and in a cage.
3. All pets outside must be on a leash no longer than six feet when walking, except when in an enclosed fenced area. No pet is allowed to be tied up outside.
4. Do not allow your pet to use any site as a bathroom. Always clean up after your pets.
5. Any nuisance pet must be removed from the community. We do not accept any aggressive dogs.
6. Pet owners are solely responsible for their dog/pet's behavior. Cottonwood Springs RV Park/Owner is not responsible for any incident involving your pet.

**Conduct:**

1. Quiet hours are from 10:00pm to 7:00am. Please be quiet and considerate of your neighbors.
2. Loud, obnoxious, disorderly, boisterous, or unlawful conduct or conduct that disturbs or threatens the rights, comfort, or convenience of others in or near the Property will not be tolerated.
3. Violence or the threat of violence will not be tolerated.
4. The consumption of alcohol must be confined to your RV site. You will be held to any applicable state, county and city laws.
5. Possession of explosives or other dangerous materials is prohibited.
6. Storage of hazardous materials on the RV site or on the property is prohibited.
7. Children – Minors and children must always be supervised anywhere on the property.

**Visitors:**

1. All visitors must register with the office before going to your site.
2. Visitors staying longer than 3 days must be approved by the management.
3. Visitors must park on your site or where directed by management.
4. You are responsible for your visitors and their behavior.

**Internet:**

WIFI and Fiber internet service plans are available to guests of the park. Please contact the office about service and pricing plan options.

Lessee(s) Initials: _DTD_

**Mail Service:**

You may have packages and mail delivered to the park. Please use your name, site number and Sedona View's main address for delivery. Please pick up your mail and packages in a timely manner. If a package or mail needs a signature for delivery, the office will sign and accept the package in the office. There will be a $5 fee added to your account for that service. The office will notify you about receiving a signed package.

**Laundry and Showers:** Coming soon.

**Check-in/Checkout:**

The Check-in is 1:00 pm on scheduled arrival date. The Checkout is 11:00 am on scheduled departure date.

Management reserves the right to change these guidelines at any time and/or refuse service for any reason. Your signature below indicates you have read, understand, and agree to follow the above guidelines.

Lessee Signature: _____ Date: 3-10-25

Lessee Signature: _____ Date: _____

Page 19

Lessee(s) Initials: _____

# EXHIBIT B

EXHIBIT B

FILED
DONNA McQUALITY
CLERK, SUPERIOR COURT
12/15/2025 12:42PM
BY: PHARDIN
DEPUTY

Brittney K. Walsh, Esq.
State Bar No. 035279
**H & M LAW, PLLC**
P.O. Box 3700
Cottonwood, Arizona 86326
(928) 554-2070 office
(928) 438-0866 fax
court@hmlawfirmaz.com

Attorneys for Defendant Happy Jack Lodge, LLC

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF YAVAPAI

| | |
|---|---|
| DANIEL T. DORIA,<br><br>            Plaintiff,<br><br>Vs.<br><br>COTTONWOOD SPRINGS RV,<br>LLC,<br><br>            Defendant. | Case No. S1300CV202580488<br><br>**NOTICE OF APPEARANCE**<br><br>(Hon. Linda Wallace) |

COMES NOW Brittney K. Walsh of H&M Law, PLLC and hereby makes her

appearance on behalf of the Defendant Happy Jack Lodge, LLC in the above-referenced

case. Please direct all future correspondence intended for COTTONWOOD SPRINGS RV,

LLC to counsel at:

///

///

Brittney K. Walsh, Esq.
H & M LAW, PLLC
P.O. Box 3700
Cottonwood, AZ  86326
(928) 554-2070 (office)
(928) 438-0866 (fax)
court@hmlawfirmaz.com

**RESPECTFULLY SUBMITTED** this 15th day of December 2025.

**H & M LAW, PLLC**

*/s/ Brittney K. Walsh*

_____

Brittney K. Walsh, Esq.
Attorneys for Defendant Happy Jack Lodge, LLC

**ORIGINAL of the foregoing efiled and emailed**
**this 15th day of December, 2025 with:**

Clerk of the Court
Yavapai County Superior Court
2840 Commonwealth Drive
Camp Verde, Arizona 86322
ptb@courts.az.gov

**COPY of the foregoing emailed**
**this 15th day of December, 2025 to:**

Daniel T. Doria
989 S Main St Ste A PMB 407
Cottonwood, AZ 86326
702-279-5326
danieldoria105@yahoo.com

*/s/ Nadine Wood*
_____

# EXHIBIT C

# EXHIBIT C

DANIEL T. DORIA
989 S Main St Ste A PMB 407
Cottonwood, AZ 86326
702-279-5326
danieldoria105@yahoo.com
Plaintiff / Pro Se

IN THE SUPERIOR COURT OF ARIZONA IN AND FOR THE COUNTY OF YAVAPAI

| | |
|---|---|
| **DANIEL T. DORIA**, | **CASE NO. S1300CV202580488** |
| Plaintiff, | |
| v. | **FIRST AMENDED VERIFIED COMPLAINT** |
| **COTTONWOOD SPRINGS RV LLC**, an Arizona Limited Liability Company; | **(Breach of Contract, Retaliation, Injunctive Relief)** |
| **HAPPY JACK LODGE, LLC**, a foreign Limited Liability Company; | |
| and JOHN DOES I-X, | **Rule 15(a) Amendment** |
| Defendants. | |

**COMES NOW** the Plaintiff, Daniel T. Doria, representing himself, and for his First Amended Complaint against Defendants, alleges as follows:

## I. JURISDICTION AND VENUE

1. **Plaintiff** is a resident of Yavapai County, Arizona, residing at [Your Address/Lot Number] (the "Premises").

2. **Defendant Cottonwood Springs RV LLC** is an Arizona limited liability company doing business in Yavapai County as the operator of the RV Park located at the Premises.

3. **Defendant Happy Jack Lodge, LLC** is a foreign limited liability company that, on information and belief, holds an ownership interest in, manages, or acts as the principal/alter-ego for Cottonwood Springs RV LLC regarding the subject property.

4. **Venue** is proper in this Court pursuant to **A.R.S. § 12-401(12)** because this action concerns the recovery of real property and the possession of a rental space located exclusively within Yavapai County. Venue is further proper under **A.R.S. § 12-401(5)** because the Defendants have contracted to perform an obligation (the Lease) within this county.

## II. GENERAL ALLEGATIONS

5. **The Contract:** On or about [Date Lease Signed], Plaintiff entered into a written Rental Agreement (the "Lease") with Defendant Cottonwood Springs RV LLC for the rental of an RV space.

6. **The Written Exception:** The Lease contains a specific, written modification authorized by Defendants' agent (Property Manager) explicitly permitting Plaintiff to engage in pet-sitting activities on the Premises. A copy of this Lease highlighting the exception is attached hereto as **Exhibit A**.

7. **The Threats:** In or around [Month/Year], Defendants' agents demanded that Plaintiff sign a *new* lease agreement that retroactively removed the written pet-sitting authorization. Defendants explicitly threatened Plaintiff with immediate eviction if he refused to sign this less favorable contract.

8. **The Retaliation:** Plaintiff refused to sign the new lease under duress, asserting his rights under the existing agreement. Immediately following this refusal, Defendants initiated a campaign of retaliatory eviction notices.

9. **The Defective Notices:** On December 9, 2025, Defendants issued a "Move-Out Notice" citing immediate termination.

   ○ This Notice was legally defective on its face as it cited **A.R.S. § 33-1476** (The Arizona Mobile Home Parks Act), whereas the subject property is governed by **A.R.S. Title 33, Chapter 19** (The Recreational Vehicle Long-Term Rental Space Act). A copy of this Defective Notice is attached as **Exhibit C**.

10. **The Cure:** Notwithstanding the defect, Plaintiff acted in good faith and fully cured all alleged breaches (including the removal of any guest dogs) within the statutory 10-day period provided by **A.R.S. § 33-2143**. Plaintiff provided written proof of this cure to Defendants on December 11, 2025. A copy of the Cure Confirmation is attached as **Exhibit D**.

## III. CAUSES OF ACTION

COUNT ONE: BREACH OF CONTRACT

11. Plaintiff incorporates the allegations set forth above.

12. The Lease constitutes a valid and binding contract.

13. Defendants breached the covenant of quiet enjoyment and the express terms of the Lease by attempting to terminate Plaintiff's tenancy for conduct (pet-sitting) that was expressly authorized in writing by Defendants' agent.

14. Defendants further breached the Lease by attempting to unilaterally modify material terms during the tenancy under threat of eviction.

COUNT TWO: RETALIATORY EVICTION (A.R.S. § 33-2148)

15. Plaintiff incorporates the allegations set forth above.

16. A.R.S. § 33-2148 prohibits a landlord from retaliating against a tenant by bringing an action for eviction after the tenant has complained of a violation or exercised legal rights.

17. Defendants' series of eviction notices were issued immediately after Plaintiff refused to capitulate to threats demanding he waive his existing contractual rights.

18. Defendants cannot demonstrate "Good Cause" for these actions as required by A.R.S. § 33-2148(B), because the alleged lease violations were either authorized by contract or timely cured under the statute.

COUNT THREE: INJUNCTIVE RELIEF (TRO)

19. Plaintiff incorporates the allegations set forth above.

20. Unless restrained by this Court, Defendants will continue to issue defective and retaliatory notices or attempt to lock Plaintiff out of his home, causing irreparable harm, including homelessness and loss of property.

21. Plaintiff has no adequate remedy at law because monetary damages cannot compensate for the immediate loss of shelter and safety.

## IV. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

A. For a Temporary Restraining Order and Preliminary Injunction prohibiting Defendants from terminating Plaintiff's utility services, locking Plaintiff out, or filing for Eviction/Restitution absent a non-retaliatory, non-cured breach of the Lease confirmed by this Court;

B. For a finding that Defendants' prior notices were retaliatory and/or legally defective;

C. For actual damages in an amount to be proven at trial;

D. For statutory damages as allowed by law;

E. For Plaintiff's costs incurred in this action; and

F. For such other and further relief as the Court deems just and proper.

**RESPECTFULLY SUBMITTED** this  15th day of December, 2025.

_____

Daniel T. Doria

Plaintiff / Pro Se

## VERIFICATION

I, **Daniel T. Doria**, declare under penalty of perjury under the laws of the State of Arizona that I am the Plaintiff in this action; that I have read the foregoing First Amended Verified Complaint and know the contents thereof; and that the statements therein are true and correct to the best of my knowledge, information, and belief.

Executed on: _____

**Daniel T. Doria**

**CERTIFICATE OF SERVICE**

**I, Daniel T. Doria,** declare under penalty of perjury under the laws of the State of Arizona that this amended complaint was served electronically to Defendant(s) via email, and electronic service via the AZEfile Court portal, on December 15, 2025.

/s/ Daniel T. Doria
Daniel T. Doria

EXHIBIT A

 **RV SITE RENTAL APPLICATION & AGREEMENT** Exhibit B

Please email completed application form to: info@cottonwoodspringsrv.com or drop off at office.
This application is intended for a set term Lease Rental Agreement with CWS.

**Please complete the following for __All Adults__ staying on the site and will be listed on the Rental Agreement:**

1. Applicant Name: _Daniel T. Doria_ Cell #: _702-279-5326_
   Driver's License: _T26139287_ State Issued: _AZ_
   Email: _danieldoria105@yahoo.com_
   Home Address: _420 Happy Jack Way Spc.#177_
   City: _Cottonwood_ State: _AZ_ Zip: _86326_

2. Applicant Name: _____ Cell #: _____
   Driver's License: _____ State Issued: _____
   Email: _____
   Home Address: _____
   City: _____ State: _____ Zip: _____
   (please attach copy of Driver's License or ID for verification purposes)

Number of adults and children staying on-site on a __regular__ basis: _1_

List name, age and relationship of __all occupants__ of the recreational vehicle:

Name: _Daniel T. Doria_ Age: _39_ Relationship: _Self_
Name: _____ Age: _____ Relationship: _____
Name: _____ Age: _____ Relationship: _____

**Rental History:**

Park Name or Current Landlord: _____
Address of Currently Renting: _____
City: _____ State: _____ Zip: _____
Telephone # of Park or Landlord: _____
Date Moved In: _____ Date Moved Out: _____
Reason for Moving: _____
Park Name or Previous Landlord: _____
Address of Previous Location: _____
City: _____ State: _____ Zip: _____
Telephone # of Park or Landlord: _____
Date Moved In: _____ Date Moved Out: _____
Reason for Moving: _____

Has either Primary Guest or any Other Occupant(s) (listed above) ever (check if applicable):

___ Been evicted or asked to move out?

___ Broken a rental agreement or lease contract?

PAGE 1

___ Been or are currently delinquent to a previous landlord?

___ A registered sex offender?

___ Been convicted of a Felony?

If any checked, please explain. _____

_____

**Employment Information:**

For Applicant Name 1: Company Name of Current Employer: Universal Canine HealthCare

Address of Employer: 9835 Main St SteA PMB407

City: Cottonwood    State: AZ    Zip: 86326    Phone #: 928-362-1168

Current Position: Director    Start Date: 2022

For Applicant Name 2: Company Name of Current Employer: _____

Address of Employer: _____

City: _____ State: _____ Zip: _____ Phone #: _____

Current Position: _____ Start Date: _____

If not currently employed, please explain income resources (i.e, retired, social security, etc.):

_____

Verification of income may be required by management.

**Vehicles: Lessee represents that he/she is the registered and/or legal owner of the following recreational vehicle or mobile recreational vehicle (hereinafter all general referred to as "RV").**

Year: 1499    Make: Fleetwood    Model: Prowler Length: 25

Vehicle ID No.: 1EC1H2620X1577403

RV License Plate: T7A4FB    State: AZ

Lessee's Liability Insurance Carrier: _____

Lessee's Liability Insurance Carrier Policy No: _____

Agents Name: _____ Agent's Telephone No: _____

**Please provide a copy of the insurance declaration page to the office.**

Slide out(s)? Yes☒ or No___ If yes, how many: __1__

Recent photo of RV must be submitted. RV must be under 10 years old, or management approval will be required ✓

**Other Vehicles:**

Make/Model of Vehicle: Toyota Prius    Year: 2012 State/Plate #: AZ/DCA37V

Make/Model of Vehicle: _____    Year: _____ State/Plate #: _____

**References: (Rental or Professional References. Family/Friends Not Accepted)**

1. Name: Kadeem O'Berry    Cell #: 917-873-2899

   Email _____    Relationship Solar Industry Peer

2. Name: Brandon Douglas    Cell #: 905-962-8228

   Email _____    Relationship Business Partner

PAGE 2

**Emergency:**

In case of emergency, notify:

Name: _David Doria_ Phone: _909-567-6580_ Relationship: _Brother_

**Pets:**

Will a pet be staying on the site: Yes _X_ or No___. Number of pets: _2_ +Petsitting If yes, please list the type, breed, and weight
of all pets: _Sam 16 yrs old 37LB Golden Cocker_
_Tima 14 yrs old 12 LBS Chi-Pom-Pom_
I authorize the Cottonwood Springs RV Resort ("CWS") and their agents, including any collection authority, to obtain further address
and employment information, and any necessary background screening information before, during and after the lease term for the
purposes of collecting past due lease payments, late fees or any other charges that are owed to CWS. I hereby authorize a credit and/or
criminal check to be made, verification of information I provided and communication with any and all names listed on this
application. I understand this is an application to rent an RV space and does not constitute a rental or lease agreement in whole or part.

The undersigned Primary Guest, and all Adult Other Occupants represent that all of the above information is true and complete and
authorize the verification of same by any means. Primary Guest and all Adult Other Occupants acknowledge that an investigative
consumer report including information as to the character, general reputation, mode of living, whichever is applicable, may be made.
Anyone on which a consumer report is made has the right to request additional disclosures and a written summary of the rights of a
consumer under the Fair Credit Reporting Act. False information given shall entitle RV Park to: (1) reject this application; (2) retain
the deposit in accordance with the site rental agreement; and (3) terminate Primary Guest's right of occupancy in accordance with the
site rental agreement. False information may also constitute a serious criminal offense under the laws of this State.

Applicant Name 1:

Signature: _____

Printed Name: _Daniel T. Doria_

Date: _3-10-25_

Cottonwood Springs RV Resort

Signature: _____

Printed Name: _Manna Hankins_

Title: _Property Manager_

Date: _3/10/25_

Applicant Name 2:

Signature: _____

Printed Name: _____

Date: _____

------------------------------------------For Internal Use Only------------------------------------------

Obtained copy(ies) of IDs ☑                    Application Fee Collected ☐
Obtained pictures of RV/Trailer ☑              Over 10 Years Approved ☐
Contacted Current/Previous Landlord(s) ☐       Contacted References ☐
Obtained Background ☐                          Contact Employer/Income Verified ☐
Notes: _____

Person verifying information: _____ Date: _____

The rules and regulations listed below apply to those who stay in this park on a Monthly and beyond basis and are in addition to the rules stated in the park's standard brochure. Our max space rental agreement is 3 months. You may extend your stay by notifying the office at least 30 days prior to your current agreement expiring. A new lease agreement must be signed 30 days prior to ensuring your current RV site.

1. This Space Rental Agreement (hereinafter referred to as "Agreement") is made and entered into for a term beginning on this _10th_ day of _March_, 20_25_ (the "Effective Date") by and between Cottonwood Springs RV Resort (hereinafter referred to as "Lessor") and _Daniel T. Doria_ and _no other_ (hereinafter referred to as "Lessee").

2. RV SITE: Lessor hereby leases to Lessee the following RV site number: _177_ (the "Site") of Cottonwood Springs RV Resort property. Lessor has the right upon twenty-four (24) hours' notice to relocate Lessee to a substantially equivalent site on the property.

3. TERM: The term of this Agreement shall commence on the date written above in paragraph 1, effective date and end on: _9th_ day of _June_, 20_25_ (the "Initial Term"). Unless terminated by either party, after the expiration of the Initial Term, this Agreement shall automatically continue to a currently monthly rate basis. Note: Rate is subject to change from the initial rental agreement amount.

4. RENTAL RATE: Lessee(s) shall pay per month $_499⁰⁰_ plus electric, billed at: $.145 per KWH (see paragraph 6). Rent is due on or before the 1ˢᵗ of every calendar month. If rent is not received before the 5ᵗʰ of the month, a late fee will be added at $15 per day until rent is paid in full. Rent shall be paid at the park's office by credit card, check, money order or cash during business office opening hours. If Lessor must give notice to terminate the Agreement for nonpayment of rent. Lessor shall not be deemed to have waived any right to terminate by accepting partial rent for the period involved. If Lessor gives notice to terminate this Agreement for any other reason, Lessor does not waive the right to terminate by accepting rent prorated to the termination date specified in the notice. A $50.00 penalty shall be charged for all returned checks/credit cards. The monthly rent is not refundable when the Lessee leaves at any time before the final day of the month or prepaid term.

5. ELECTRIC UTILITY: Lessee shall pay Lessor, in accordance with the schedule for payment of the rate checked in Paragraph 5, above, all electrical power charges used by Lessee in connection with the use of the RV Site. This amount is based on $.145 per kWh and is calculated by Lessor. Lessee is only allowed to use the power box signed to the rented site. Lessee is not allowed to use any other power boxes on the premises. Power boxes must not be tampered with in any way. If power boxes show tampering, the Lessee will be charged for the repairs, and the Agreement will be terminated immediately. The beginning meter reading as of the Effective Date of this Agreement is _2301 kwH_

6. SECURITY DEPOSIT: Lessee shall pay the amount of $ _0_ _Promotion_ for a security deposit, paid on _____ which shall be refunded upon termination of the Lessee's tenancy in the park to the extent that the amount is not necessary to remedy the Lessee's default in the performance of this Agreement and/or to repair damages to the space or park caused by the Lessee, not including ordinary wear. The Lessee's RV damages caused by natural disaster (flood, earthquake, drought, strong wind, etc.), and theft shall be covered by the Lessee's own RV insurance. If the Lessee is in good standing with account and a written 30-day notice, the security deposit may be used for the last month's rent. Any fees, like electricity or other fees, or outstanding balance will still be due for that last month prior to end of lease.

7. PETS: Pets are welcome with responsible pet owners. Up to two (2) pets are allowed (unless approved by management). All pets must be on a leash when outside the RV. Lessee must have proof of their pet's vaccinations available. Pet owners must clean up after their pets including all pet excrement. Do not allow your pet to use any RV site as a bathroom. Noisy, destructive, aggressive, unleashed, or dangerous pets will be cause for immediate eviction. Lessee is liable for any damage or injury caused by his or her pet. No pet shall be allowed to run loose in the park and no pet shall be left tied outside, unattended by Lessee. Pets must be kept off other people's RV spaces. Birds, rodents, and reptiles must be always kept in RV and in a cage. Describe pet(s):

_____.

Lessee(s) Initials: _DTD_                                                                                         P a g e | 1

8. CREDIT/DEBIT CARD ON FILE: Lessee is to provide Lessor with information for a valid credit card to be kept on file. The credit card information will be used by Lessor to initiate payment for situations arising from the following:
   a) Any damage, or cleaning / repairing of the RV Site caused by Lessee and, or, their guests, or invitees.
   b) If Lessee vacates the RV site without paying Lessor, the total amount due under this Agreement. Final electric bill and any outstanding balance upon checking out, Lessee will be charged the total amount owed on the card.

   *If Lessor uses the credit card information for the reasons described above, Lessor will provide Lessee with a statement of account, listing the charges. In the event of reversal and/or denial of legitimate charges by Lessee, a fee of $100.00 plus attorney fees will be charged. Lessee agrees to update Credit/Debit Card on File with any changes to the card with the office.

9. RULES AND REGULATIONS: Lessee and their guests, invitees and all occupants shall comply with the written rules and regulations provided to Lessee. Lessee agrees to comply with all state and federal laws, rules, ordinances, and regulations applicable to Lessor's property. See Addendum B: Park Rules and Regulations.

10. RENTING OR SUBLETTING: Lessee shall not sublease or otherwise rent all or any portion of Lessee recreational vehicle or the premises. Lessee shall not assign or encumber his or her interest in this Rental Agreement or the premises. No consent to any assignment, encumbrance, sublease or other renting shall constitute a further waiver of the provisions of the paragraph. The only parties allowed to stay in the RV in this park are those specifically named herein. No other people may reside in the RV without the written permission from Lessor.

11. TERMINATION OF AGREEMENT: This Agreement may be terminated by either party upon giving a 30-day notice in writing. Lessor reserves the right to terminate this Agreement with a shorter period of notice if allowed by law. If state or local laws require an RV to be moved from the park for any reason, this Agreement will automatically terminate, and the notice time may be shorter. This Section supplements Section 4 of this Agreement; this Agreement terminates on the earliest termination dates specified in Section 4 or on the termination date established or allowed by this section.

12. DEFAULT BY LESSEE: The following acts constitute defaults by Lessee ("Acts of Default"):
   a) Failing to timely pay the Rental Rate, outlined in Paragraph 5, above, or other lawful charges when due under this Agreement
   b) Giving false information to Lessee, Lessee's guests and/or occupants failing to comply with this Agreement, such as violating provisions of this Agreement or committing serious misconduct or criminal acts
   c) Remaining on the Property after giving notice of termination and intent to vacate; and/or
   d) Remaining on the Property after Lessor gave notice of termination at the end of the term or an Agreement Termination Notice, outlined in Paragraph 12, above.

13. TOWING POLICY: Non-payment of site rent or services and or violations of rules can result in vehicles/RVs being towed and impounded at the owner's expense. A 24-hour towing/impound notice will be posted on any and all vehicles to be removed.

14. ENTRY UPON RESIDENT'S SPACE: The Lessor shall have a right of entry upon the land on which a recreational vehicle is situated for maintenance of utilities, maintenance of premises if the occupant fails to do so, and the protection of the park at any reasonable time. However, such an entry shall not be in a manner at a time which would interfere with Lessee's quiet enjoyment. The Lessor may enter a recreational vehicle without the prior written consent of the occupant in the case of an emergency or when the occupant has abandoned the recreational vehicle.

15. LESSEE'S RESPONSIBILITIES:
   a) Lessee shall be responsible for all damage caused by Lessee or any of Lessee's guests or visitors.
   b) Lessee agrees to obey all park rules and regulations contained in this Agreement, posted or distributed.

Lessee(s) Initials: DTD

*Lessee babysits up to 4 dogs at one time + typically 1-2. PTD*

c) Lessee acknowledges the space is to be used only by Lessee for private residential or recreational purposes and shall be used by no other persons except those people listed in this Agreement. No business or commercial activity of any nature shall be conducted in this park. Lessee agrees to immediately deliver possession of the space rented hereunder upon the expiration on the term of this Agreement.

d) Lessee acknowledges and agrees that Lessor shall have no responsibility for Lessee's safety or the safety or protection of any of Lessee's possessions. Lessee acknowledges that the park entrance is not guarded or patrolled, and that Lessee is responsible for locking his/her RV in order to help prevent loss or damage. Lessee agrees to notify Lessor and/or the police in the event Lessee observes or learns of suspicious or illegal acts within the park.

e) Lessee agrees that at the end of the term of this Agreement Lessee shall move the RV out of the park and shall have no right to leave it or sell it to be left in the park. If someone buys the RV, the buyer must move it immediately.

f) Lessee acknowledges and agrees that the RV site is in good condition and is adequate for Lessee's use. Upon termination or expiration of this Agreement, Lessee agrees to surrender the RV site to Lessor in a similar, good condition. If Lessee fails to leave the RV site in good condition, Lessor will assess reasonable charges to Lessee for returning the RV site to good condition.

g) Lessee agrees to hold harmless and indemnify Happy Jack Lodge dba Cottonwood Springs RV Resort, its members, and employees of all liabilities for loss or damage of property or injury of person or persons or animals arising from the use of Cottonwood Springs RV Resort property.

h) Lessee is responsible for carrying and providing proof of insurance for all vehicles and RV.

16. LEGAL REMEDIES, PROVISIONS AND GOVERNING LAW:

a) Lessor agrees that any notice of nonpayment of rent or termination of tenancy shall be deemed served on the day on which it is attached in a secure manner to the main entrance of the RV and, if required by law, mailed to Lessee.

b) If written notice is required by law to terminate this rental Agreement, the tenancy shall terminate of the day designated in the Notice of Termination without regard to the expiration of the period for which rent is to be paid.

c) In the event Lessee breaches this Agreement, Lessor shall have available to Lessor all remedies provided at law or in equity.

d) If any action is required to enforce or interpret this Agreement, then the prevailing party shall be awarded reasonable cost and attorney fee from the losing party.

e) If Lessee abandons the RV described herein, or any other personal property, Lessor may sell or dispose of said RV or other personal property, as permitted under Arizona law. Lessee shall pay, upon demand, all costs and expenses incurred by Lessor in the moving or storing of Lessee's RV or personal possessions, plus court costs and attorney fees incurred in selling or otherwise disposing of the personal property and/or RV abandoned by the Lessee.

f) If any provision of this Agreement is held to be invalid, illegal or unenforceable then that provision shall not affect the validity, legality, or enforceability of the other provisions herein, then the parties agree that the remainder of this Agreement shall remain in forced and affect. Lessee shall not seek recovery of damages from Lessor for attempting to enforce such provision, rule, regulation or policy in good faith prior to receiving notice of its invalidity or illegality.

g) No delay or omission in the exercise of any right or remedy of Lessor following the event of default by Lessee shall impair any such right or remedy or be construed as a waiver. No waiver by Lessor of Lessor's rights to enforce any provision hereof after any default on the part of Lessee shall be effective unless made in writing and signed by Lessor, nor shall it be deemed a waiver of Lessor's right to enforce each and every other provision hereof upon further or other default on the part of Lessee. Lessee understands that if Lessor fails to enforce any term of this Agreement, Lessor is still entitled to enforce the Agreement on any subsequent occasion. Acceptance of rent shall not be, or construed to be, a waiver of any breach of any term or provision of this Agreement, nor shall it reinstate, constitute or extend the term of the Agreement or affect any notice, demand or suit hereunder.

Lessee(s) Initials: _____                                        Page | 3

h) This Agreement constitutes the product of negotiations of the parties hereto and any enforcement hereof will be interpreted in a neutral manner and not more strongly for or against and party based upon the source of the draftsmanship hereof.

i) This Agreement constitutes the entire agreement between and among the parties, interpreted all of the terms and conditions mentioned herein or incidental hereto, and supersedes all negotiations or previous agreements between the parties or their predecessor in interest with respect to all or any part of this suspect matter hereof.

j) Lessee agrees they will not post any negative social media without first giving the Lessor the time to remedy Lessee complaints in writing. Such postings that may result in any damages or fees will be paid by the Lessee to the Lessor.

k) If Lessee or guests of the Lessee must be trespassed for any reason: A trespasser is defined as someone who knowingly enters or remains unlawfully on another person's property without permission or legal authorization to do so. Trespassing can include entering private property, hopping a fence, entering a building or structure, or remaining on the property after being asked by the owner to leave. According to Arizona Revised Statutes (A.R.S.) 13-1502, criminal trespass in the third degree. Knowingly entering or remaining unlawfully on any real property after a reasonable request to leave has been made by the Lessor, property owner, a law enforcement officer or anyone with lawful control over the property, or if the property had a notice posted that prohibited entry. If we ask you to leave, you must vacate the property. We will prosecute any violations under the criminal trespass statute. This will also constitute as immediate termination of this Agreement.

l) Criminal activity: See Addendum A

TERMS: Lessee certifies that the included printed material beginning on page 1 through page 9 (including Addendum A and Addendum B) of this Agreement has been read and the terms and conditions set forth herein are understood. Lessee further certifies that he/she has examined the space in which the subject RV is to be placed and finds it suitable and acceptable. Lessee acknowledges has also read and will comply with the Park Rules and Regulations (see Addendum B).

Lessee also acknowledges receipt of an executed copy of this Agreement including Addendums A and B.

Lessee certifies that the above information is correct and complete.

Lessee understands that if any of this information is later found to be false, it may be grounds for eviction and termination of this agreement.

Lessee authorizes the park management to conduct any credit checks or other inquiries necessary for verification of this information before or during this Agreement term.

Lessee understands that the park management has the right of refusal upon the arrival of the RV described in this application.

Lessee(s) Initials: _____

Additional acknowledgement(s):

To contact the onsite manager: Manager@cottonwoodspringsrv.com

To contact the General Manager: GMLLC@happyjacklodge.com

Lessee: _____
Signature

Date: 3-10-25

Lessee: _____
Signature

Date: _____

Lessor: Cottonwood Springs RV Resort

_____
Agent's Signature

_____
Agent's Printed Name

Date: 3/10/25

Lessee(s) Initials: DTD

### Addendum A: Zero Tolerance for Criminal Activity

**Leased Premises: Cottonwood Springs RV Resort**
**420 Happy Jack Way, Cottonwood AZ. 86326**

This Lease Addendum is incorporated into and made a part of the Agreement executed by the Lessor and the Lessee referring to and incorporating the Leased Premises.

The Lessor has zero tolerance for criminal activity in or around the Leased Premises.

This policy applies to all Lessee(s), occupants, guests, and any visitors in or around the Leased Premises. The Lessor/property manager/or agent will immediately report any evidence of criminal activity to the proper authorities, and the Lessee(s) engagement in any criminal activity is a breach of the Agreement.

The Lessee understands his/her responsibility to call the police/emergency services and report any suspicious activity observed and then notify the Lessor and/or office immediately.

The Lessee(s) understands that disturbances of the peace not only infringe on the neighbors' peaceful enjoyment of their property is a breach of the Agreement.

In the event of any criminal activity in which the Lessee(s) is directly or indirectly involved, the Lessor will take the legal measures necessary to evict the Lessee(s) from the Leased Premises. This includes but is not limited to illegal drug activity, gang involvement, organized crime and disturbances of the peace.

The Lessee(s) understand that violation of this addendum is a breach of the Agreement and will result in the Lessor taking the necessary steps towards the eviction of the Lessee(s). The Lessee(s) may then be responsible for the rent remaining due for the balance of the Lease term, court costs, attorney fees, and other charges in accordance with all applicable Arizona local laws and regulations.

Lessee Signature: _____    Date: 3-10-25

Lessee Signature: _____    Date: _____

Lessee(s) Initials: _DTD_                                   Page | 6

### Addendum B: Park Rules & Regulations

**RV and Site Appearance:**

1. Your RV must be in good repair, good physical appearance, legal/licensed, roadworthy and be certified by RVIA or RPTIA. You must be able to move your RV at any time with no expectation of prior notice. Management has complete discretion as to whether your RV meets these guidelines. If the RV is over ten years old, the Management must approve prior to move-in or change in RV listed on the original lease agreement.

2. Pop-up trailers, pick-up campers, horse trailers, and tents are not permitted.

3. Window A/C units are not allowed unless approved by management.

4. Sleeping outside the RV is not allowed.

5. A sewer hose "donut" or "L" connector is required.

6. Washing of RV or vehicles is not permitted unless you hire a mobile detailer that is fully equipped and self-contained with water. The company must be approved through management before conducting work on property.

7. Portable gazebos and canopies require management approval before being set up.

8. Portable satellite dishes or internet are allowed but must be placed within the rented site and secured. Lessor is not responsible for any damage that may occur to the satellite. Satellite dishes or internet devices may not be mounted to any to anything belonging to the park, such as rocks, trees, site electrical poles, pavement or anything affixed to the property.

9. Construction of decks, sheds or any other structures require written approval from management.

10. You may not alter the appearance of the site without prior written approval from management. This includes the addition of plants, gravel or steppingstones. Planters are allowed on hard surfaces only and must be well maintained.

11. RV skirting must be vinyl snap on type specifically designed for an RV and approved by management.

12. Off the ground fire bowls/pits are allowed but must have a spark arresting cover. Do not leave your fire unattended. Fire must be completely extinguished after each use. You are responsible for emptying ashes in the designated area. Please see management for location.

13. No outside appliances are permitted on your site. Please keep outside storage to a minimum. Periodically, you may be asked to pick-up your site.

14. Holiday decorations are allowed and even encouraged. Decorations must be contained on your site and Management has complete discretion as to whether your decorations are appropriate. Please be considerate of your neighbors when decorating and turn them off at quiet hours.

15. A dumpster will be made available. NO mattresses, large items, electronics or hazardous materials (paint, oil, etc.) are allowed.

16. Please put trash in designated dumpsters. Do not leave trash outside when the dumpster is full. Either use one of the other dumpsters on property that is not full or wait until dumpsters are empty to dispose of your trash.

16. Keep your space free of litter, including cigarette butts.

17. Ensure you do not leave any food or trash outside your RV to not entice animals to enter the park looking for food.

18. Each site is designated for only one RV.

19. RVs are to be lined up next to the water/sewer/electrical panel, where your door will open on the opposite side. At no time can the RV be parked another way resulting water/sewer/electrical hoses be run under the RV and across site to accommodate parking on incorrect side of the site.

20. DARK SKY COMMUNITY - Lighting around the perimeter of your RV is allowed. Lighting on the ground or around the bottom of the RV has no time restrictions. However, any lighting on RV or above the bottom of the RV must be turned off by 10 pm, except for illumination for walkways, roadways, parking areas, and outdoor security as detailed by Yavapai County Law Enforcement.

21. Site markers may not be moved or changed.

Lessee(s) Initials: _____

Page | 7

**Vehicles:**

1. The Speed limit is 5MPH. Speed limit will be enforced. Fines may be charged for speeding. Habitual speeding may constitute in termination of Agreement.
2. You are allowed to have your RV and up to two (2) vehicles and must be parked within the rented spot.
3. Offsite storage is required for boats, flatbed trailers, car dollies, etc. Please contact the office for more information on storage options.
4. To maintain a pleasant looking community, we ask that any broken down, or "work in progress" cars be removed from the community. Lessee will have 24 hours to remove it, or Lessor reserves the right to have it towed at Lessee's expense.
5. No mechanical work (changing oil, etc.) is allowed.
6. No parking on any empty site, without prior written consent from management.
7. No parking on the roadways at ANY time.
8. Vehicles must be parked within your site and cannot block another site.

**Pets:**

**IMPORTANT: Please beware that coyotes, snakes and birds of prey could be in our area and could potentially pose a threat to your pet. DO NOT leave them outside unattended.**

1. Extended stay guests are allowed a total of two (2) pets.
2. Birds, rodents, and reptiles must be always kept in your RV and in a cage.
3. All pets outside must be on a leash no longer than six feet when walking, except when in an enclosed fenced area. No pet is allowed to be tied up outside.
4. Do not allow your pet to use any site as a bathroom. Always clean up after your pets.
5. Any nuisance pet must be removed from the community. We do not accept any aggressive dogs.
6. Pet owners are solely responsible for their dog/pet's behavior. Cottonwood Springs RV Park/Owner is not responsible for any incident involving your pet.

**Conduct:**

1. Quiet hours are from 10:00pm to 7:00am. Please be quiet and considerate of your neighbors.
2. Loud, obnoxious, disorderly, boisterous, or unlawful conduct or conduct that disturbs or threatens the rights, comfort, or convenience of others in or near the Property will not be tolerated.
3. Violence or the threat of violence will not be tolerated.
4. The consumption of alcohol must be confined to your RV site. You will be held to any applicable state, county and city laws.
5. Possession of explosives or other dangerous materials is prohibited.
6. Storage of hazardous materials on the RV site or on the property is prohibited.
7. Children – Minors and children must always be supervised anywhere on the property.

**Visitors:**

1. All visitors must register with the office before going to your site.
2. Visitors staying longer than 3 days must be approved by the management.
3. Visitors must park on your site or where directed by management.
4. You are responsible for your visitors and their behavior.

**Internet:**

WIFI and Fiber internet service plans are available to guests of the park. Please contact the office about service and pricing plan options.

Lessee(s) Initials: _____

**Mail Service:**

You may have packages and mail delivered to the park. Please use your name, site number and Sedona View's main address for delivery. Please pick up your mail and packages in a timely manner. If a package or mail needs a signature for delivery, the office will sign and accept the package in the office. There will be a $5 fee added to your account for that service. The office will notify you about receiving a signed package.

**Laundry and Showers:** Coming soon.

**Check-in/Checkout:**

The Check-in is 1:00 pm on scheduled arrival date. The Checkout is 11:00 am on scheduled departure date.

Management reserves the right to change these guidelines at any time and/or refuse service for any reason. Your signature below indicates you have read, understand, and agree to follow the above guidelines.

Lessee Signature: _____ Date: 3-10-25

Lessee Signature: _____ Date: _____

page | 9

Lessee(s) Initials: _____

EXHIBIT C

Exhibit A

**Notice of Material and Irreparable Breach**
**Immediate Notice to Move**

Daniel T. Doria  Site 177        Cottonwood Springs RV
720 Happy Jack Way              720 Happy Jack Way,
Happy Cottonwood, AZ 86326     Cottonwood, AZ 86326
                                (928) 649-1878
Tenant(s) Name / Address / Phone      Landlord(s) or Agent's Name / Address / Phone

Notice Date: 11-20-2025              GM - Julie Pendergast

You have violated your rental agreement. **The violation(s) cannot be fixed. Your landlord wants you to move out now and return the keys immediately.** The following is what happened, where it happened and when. Attach additional sheet(s) if needed.

Your signed agreement with Cottonwood Springs RV commenced on June 9th 2025 and our agreement has been month to month, Term #3, cited on page 1, states either party may terminate anytime after the expiration of the initial term. This is our official notice of terminating our agreement due to inappropriate communication with staff and the general manager and not completing a background and new lease agreement as required by the park.

An eviction action may be or has been filed against you. If an eviction action has been filed, you have the right to appear in court to dispute the eviction action. After a hearing, the judge will decide if you have to move or if you can legally stay in the rental. If a judgment is entered against you, a Writ of Restitution (a court order to have you removed from the rental) may be issued between 12-24 hours from the date a judgment is signed and you may be required to pay damages, attorney fees, and court costs.

11/20/2025
Date

Julie C. Pendergast
Signature    ☐ Landlord ☑ Agent  General Manager

This notice is served by:
☐ Hand delivery to (name): _____ who is the ☐ tenant ☐ occupant
☐ By certified mail (mail receipt #): _____

This notice is given under A.R.S. § 33-1368(B). The laws about this notice are found in the Arizona Residential Landlord and Tenant Act. For more information on the Act, eviction actions, and your rights, please visit the Forms and Notices (azcourts.gov), Arizona Department of Housing, AZLawHelp.org, or AZCourtHelp.org.

Arizona Supreme Court          Page 1 of 1          AOCEAGN4F-122823

\* Also, on October 7, 2025, the general manager and on-site manager discussed you were in violation of the pet rules due to babysitting (for money) numerous dogs on the property, which is prohibited. You agreed to move-out Oct 30th (end of the month)

EXHIBIT D

 Gmail

Daniel Doria <dtdoria85@gmail.com>

## Cured Breaches - Complete
1 message

**Daniel Doria** <dtdoria85@gmail.com>                    Thu, Dec 11, 2025 at 10:20 AM
To: Mike Mongini <mmongini@gustlaw.com>

Mr. Mongini,

Please note that all cited alleged lease breaches have been cured.

If there are other alleged breaches, please cite them so that they can be addressed.

If Cottonwood Springs RV LLC would like to initiate the background check process, please let me know when and where to proceed.

Notice of the cited alleged breaches and their cure notice will be filed with the court.

Regards,

Daniel Doria

 Email tracked with Mailsuite · Opt out

# EXHIBIT D

# EXHIBIT D

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF YAVAPAI


DANIEL DORIA,                          )
                                       )
                     Plaintiff,        )
                                       )Case No.
vs.                                    )S1300CV202580488
                                       )
COTTONWOOD SPRINGS RV LLC,             )
                                       )
                     Defendant.        )
_____)
                            ____


TRANSCRIPTION OF FTR AUDIO RECORDING

EVIDENTIARY HEARING

DECEMBER 29, 2025

BEFORE THE HONORABLE LINDA WALLACE


Transcribed by:      Ashlee Mangum
                     Registered Professional Reporter
                     Certified Reporter #50612

INDEX

WITNESS                                                   PAGE

   Julie Pendergast

        Direct Examination by Mr. Doria:        14

        Cross-Examination by Ms. Walsh:         58

        Redirect Examination by Mr. Doria:      78

   Daniel Doria

        Testimony to the Court:                 80

        Cross-Examination by Ms. Walsh:         90

        Additional Testimony to the Court:      101

   Julie Ann Martin

        Direct Examination by Ms. Walsh:        104

        Cross-Examination by Mr. Doria:         107

(The recording begins at FTR Timer 2:36:31 p.m.)

THE COURT:  P1300CV202580488, in the Matter of Daniel Doria versus Cottonwood Springs RV, LLC.

If I could please have the Plaintiff state his name into the microphone.

MR. DORIA:  Daniel Doria.

THE COURT:  Thank you.

If I can please have counsel announce presence?

MS. WALSH:  Good afternoon, Your -- good afternoon, Your Honor, Brittany Walsh on behalf of Happy Jack Lodge and Cottonwood Springs.

THE COURT:  All right.  Thank you.

This is the time set for an Evidentiary Hearing regarding the temporary restraining order request for preliminary injunction filed by the Plaintiff, but we have some procedural matters that we need to talk about before we get to that.

All right.  I'm going to go through my understanding of some of the procedural backgrounds, and then I will tell the parties where my concerns lie.  And if you want an opportunity to see if you can reach an agreement on procedure, then I'll listen to your agreement.  Otherwise, I'll just make a decision on how

to move forward.

Okay.  So the Plaintiff initially filed this case against Cottonwood Springs RV, LLC.  The statutory agent for Cottonwood Springs RV, LLC was served.  The parties came for a scheduling conference on the motion for temporary orders and -- sorry, emergency motion for temporary restraining order and preliminary injunction which was filed on December 1st of 2025.

So on December 15th is when we met and we scheduled today's hearing.  And that same day, the Plaintiff filed a First Amended Complaint.  It included, added an additional defendant for Happy Jack Lodge, LLC.  Happy Jack Lodge, LLC filed an answer, I believe that was on December 22nd of this year on behalf of Happy Jack Lodge, LLC, not on behalf of Cottonwood Springs RV, LLC.

When we set today's hearing, Happy Jack Lodge, LLC was not a party to the case.  The motion for temporary restraining order and preliminary injunction was directed at the only defendant at that time which was Cottonwood Springs RV, LLC.  I haven't seen that the request for temporary restraining order and preliminary injunction has been amended to include Happy Jack Lodge, LLC, and Happy Jack Lodge, LLC, was not -- did not participate in the scheduling of today's hearing.

I did not see, but it could be in processing, so I'm looking to Ms. Walsh to tell me if Cottonwood Springs RV, LLC has already filed a motion to dismiss because they still remain in the action under this First Amended Complaint.

MS. WALSH:  No.  There is no motion to dismiss in process, and it is my understanding, and, I'm going to look to my client here, that Cottonwood Springs is a DBA.  It is not an LLC.  So, I don't know if that makes a difference to the court.

THE COURT:  Well, there's no statutory agent then separate, so let me make sure I'm understanding.

You're saying that Cottonwood Springs RV, LLC as an entity does not exist, rather it's a doing business as that's owned by Happy Jack Lodge, LLC?

MS. WALSH:  That is correct.

THE COURT:  Okay.

MR. DORIA:  Your Honor?

THE COURT:  Yes.

MR. DORIA:  May I?

THE COURT:  So did I state any of the process incorrectly for our procedural background?

MR. DORIA:  No, Your Honor.

THE COURT:  Okay.  And if you were planning on making argument to me, I'm going to have you hold off

because we have a procedural difficulty how do we move forward today when I don't have allegations directed at the correct LLC. And I can give you an opportunity to speak with Ms. Walsh first before the parties need to argue to me on how I should proceed today.

MR. DORIA: I can speak with Ms. Walsh. You allowed Ms. Walsh to indicate they're not an LLC. I was just going to indicate that they are an LLC.

THE COURT: And what happened before I make any decision on how we move forward is I'll let the parties argue at that time.

MR. DORIA: Okay.

THE COURT: But I want to see if the two of you can talk and try to work out these procedural hurdles; and if not, then I will take information from both parties.

MR. DORIA: Understood, Your Honor.

THE COURT: All right. We are going to take a brief recess. I'm going to hear my previous case while the parties discuss this and then we will go back on the record. We're at recess.

MR. DORIA: Do you want me to step out?

THE COURT: That would be great. We'll be very quick.

(The court handles another matter on the FTR

recording.)

(A break in the FTR recording occurred from Timer 2:43:54 p.m. to 2:45:05 p.m.)

THE COURT:  All right.  I have the parties back in Cause S1300CV202580488 in the matter of Daniel Doria versus Cottonwood Springs, RV, LLC.

As I stated, I note for the record the presence of the parties with counsel as previously announced.

Mr. Doria, were you and Ms. Walsh able to come to an agreement?

MR. DORIA:  We were, Your Honor, and I believe we're going to proceed today.

THE COURT:  Okay.  Ms. Walsh, you want to tell me the substance of the agreement from your understanding?

MS. WALSH:  Yes, Your Honor.  We can proceed against the Cottonwood Springs RV, LLC as far as the preliminary injunction goes today.

You know, the -- it's a little convoluted as far as the entities go, but we agree that it would be best to proceed today and not delay this or kick the can down the road.

THE COURT:  Okay.  So explain to me how that happens because if we do the evidentiary hearing and it

results in an order favorable to the Plaintiff, Cottonwood Springs RV, LLC is the only defendant on that order, is it an enforceable order?  Or if they're not the owner, is it an unenforceable order?

MR. DORIA:  The -- the main landlord on the lease is Cottonwood Springs RV, Your Honor.  So I think if there was a court order prohibiting any type of eviction action against that landlord and then Happy Jack Lodge attempted to proceed with an eviction action, I would share that information with the court at that time.

THE COURT:  Under the current -- I'm thinking.

Happy Jack Lodge, LLC, without a stipulation of the parties that they are included as a defendant in the request made in the emergency motion for temporary restraining order and preliminary injunction filed before it became a party, it -- I don't believe it would be binding on Happy Jack Lodge.  I think you would need that type of stipulation.

MS. WALSH:  We would be willing to make that stipulation.  My client intends to abide by the court order no matter who it's -- which entity it's against. So whatever the court decides here today, my client intends to honor that order under both entity names.

And if the court believes that a stipulation between the parties would fix the procedurally defect, we are willing to make that stipulation.

THE COURT:  Okay.  All right.  I do believe that can resolve.  And to be clear, though, with that stipulation, that's including waiving the Happy Jack Lodge, LLC from separately being able to upload additional exhibits for today or have additional witnesses for today other than what you're already planning on presenting.

MS. WALSH:  That works for us, Your Honor.

THE COURT:  Okay.  I just want to make sure that with that stipulation there's kind of an acknowledgment that those other rights that would normally accrue procedurally are -- you understand the impact of it?

MS. WALSH:  Yes, Your Honor.

THE COURT:  Okay.  So, Mr. Doria, sound like a stipulation to you?

MR. DORIA:  It does, Your Honor.

THE COURT:  Use your microphone.

MR. DORIA:  It does, Your Honor.  Thank you.

THE COURT:  All right.  Thank you.

So the court is going to proceed today with the stipulation that the emergency motion for temporary

restraining order and preliminary injunction dated December 1st, 2025, also will apply to Happy Jack Lodge, LLC, and that Happy Jack Lodge, LLC waives whatever rights it would have had for providing separate witnesses or exhibits other than what was prepared for the Cottonwood Springs RV today.

All right.  One more preliminary matter, and then I'll listen to the parties if you have preliminary matters, that is I have a motion to deem service complete based on statutory appointment and estoppel that was dated on December 17th, 2025, and filed by Mr. Doria.

My understanding is that this is moot because I have an answer to the First Amended Complaint on behalf of Happy Jack Lodge, LLC.  But if I'm mistaken, I'm giving both parties an opportunity to speak up.

Mr. Doria?

MR. DORIA:  I have the same understanding, Your Honor.

THE COURT:  Ms. Walsh?

MS. WALSH:  Yes.  We -- my client waived service and we've appeared and answered, so. . .

THE COURT:  All right.

MS. WALSH:  It's moot.

THE COURT:  I am therefore denying, it's moot, the motion is deem service complete based on statutory appointment and estoppel that was filed by the Plaintiff on December 17th, 2025.

One more just quick procedural, I know I told you I only had one, I actually had an extra one, and that is, Mr. Doria, on your list of witnesses and exhibits, your mailing certificate didn't identify which email address to whom you were sending it and for which defendants.  And so, I'm going to check with Ms. Walsh.

Ms. Walsh, did you receive a copy of Mr. Doria's Plaintiff's witness and exhibit list for evidentiary hearing?

MS. WALSH:  Yes, Your Honor.

THE COURT:  Okay.  So, Mr. Doria, this will be sufficient for today, but in the future, you have to abide by the mailing certificate requirements of the Rules of Civil Procedure.

MR. DORIA:  Understood, Your Honor.  My apologies.

THE COURT:  Okay.  All right.  Mr. Doria, any other preliminary matters we need to address before we get started?

MR. DORIA:  No, Your Honor.

THE COURT:  Ms. Walsh?

MS. WALSH:  Nothing at this time, Your Honor.

THE COURT:  All right.  I'm invoking the rule of exclusion of witnesses.  So if any party has non-party witnesses, they have to remain out in the hallway until they are called.

No one can sit in and listen to other testimony other than the LLC representative, client representative, and be later allowed to testify.  So if you have questions about that, you can ask.

Mr. Doria, would you like to make an opening?

MR. DORIA:  Yes, Your Honor.  Do I need to be standing or can I make it seated -- seated here?

THE COURT:  My preference is that you are speaking into a microphone.  So if you are wanting to sit, that's fine.  I just need you into a microphone.  Some people are trained to stand and they need to go to the podium.

MR. DORIA:  I'm going to try it sitting, Your Honor.

THE COURT:  Great.  Okay.  Go ahead.

MR. DORIA:  So we're going to see evidence today specifically that explains the reason why my landlord wants me off of the property.  We're going to

see multiple threats of eviction and we're going to see lease terminology that counters the argument of the Defendant.  But most importantly, it's going to be -- hopefully, my evidence is going to be clear that there is an absolutely clear and imminent threat to me and my safety.

That's all I had, Your Honor.  I didn't really prepare an opening today.

THE COURT:  Ms. Walsh, would you like to make an opening?

MS. WALSH:  I'll waive opening, Your Honor.

THE COURT:  Okay.  Mr. Doria, who will be your first witness?

MR. DORIA:  I'd like to call Julie Pendergast.

THE BAILIFF:  Face the clerk.  Raise your right hand.

THE CLERK:  Do you solemnly swear or affirm upon penalty of perjury the testimony you are about to give will be the truth, the whole truth, and nothing but the truth so help you God?

THE WITNESS:  I do.

THE BAILIFF:  Okay.  Come forward, please. (Indiscernible).

THE COURT:  All right.  Ma'am, please state

your name.

THE WITNESS:  Julie Ann Pendergast.

THE COURT:  And you might need to move the microphone a little bit more up.  There you go.

All right.  Mr. Doria, you may ask your questions.

MR. DORIA:  All right.  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. DORIA:

Q.  Ms. Pendergast, thank you for coming today.  I'll start and just get quickly into it.

You are the general manager for Happy Jack Lodge, LLC and Cottonwood Springs RV, LLC; is that correct?

A.  Yes, I am.

Q.  And did you sign the notification for the defendant's answer filed on December 22nd, 2025?

A.  Yes.

Q.  Were you just looking to your counsel to signal the answers?

A.  I was going to try to see if there is going to be a copy of it.  Any time we're speaking about signatures, I wanted to make sure I was looking at the document.

Q.  Did you read the document completely before signing it under penalty of perjury?

A.   I sign after reading any document, yes.

Q.   Just to confirm, the verification that you signed this morning, you read it before you signed it, correct?

A.   Yes.

MS. WALSH:  Objection.  Relevance.

Q.   (Continued by MR. DORIA:)  Who's Marina Hankins?

THE COURT:  Hold on.  Hold on a second.

Mr. Doria, I have an objection based on --

MR. DORIA:  I apologize, Your Honor.

THE COURT:  -- so I need to address that objection.  So it's up to you to argue --

MR. DORIA:  The relevance is this morning I believe Ms. Pendergast swore to a multitude of facts and we're going to discuss those facts today, so I need to know if she read it before she signed it.

THE COURT:  And I'm not following what you're talking about because I have a First Amended Verified Complaint filed on December -- sorry, that's yours.  Just a moment.

I have a verified answer to the First Amended Complaint filed on December 22nd, 2025, and you are referencing something signed this morning.  Am I missing something?

MR. DORIA:  Your Honor, I apologize.  I should have been clearer, Your Honor.  This is -- this

morning I received a signed disclosure statement with exhibits and statements from the Defendant, and I was expecting it about a week ago.  So I just wanted to confirm that since she signed it this morning she read it before she did.

MS. WALSH:  Your Honor, if I may add an additional objection then, which is improper impeachment.  She's given no testimony for him to impeach her with something that she signed today.

THE COURT:  Okay.  So --

MR. DORIA:  It's --

THE COURT:  Hold on a second.  So first, you put a lot in there, Mr. Doria, and disclosure statements I don't understand why you were expecting that we have the answer.  The disclosure statement, I don't believe, would be due quite yet in this matter based on when the answer was filed.

But I am going to sustain the objection on relevancy, and I'll let you get to your next point.

MR. DORIA:  Okay.

Q.   (Continued by MR. DORIA:)  Who is Marina Hankins?

A.   Marina Hankin was a previous employee of mine that worked at Cottonwood Springs in the office.

Q.   Was Marina Hankins the property manager of Cottonwood Springs Resort on March 10, 2025?

A.   No.

Q.   Did Marina Hankins have the authority to sign lease agreements on behalf of the company?

A.   Yes.

Q.   Why was Marina Hankins omitted from your initial disclosure statement's witness list?

MS. WALSH:  Objection.  Leading.

THE COURT:  Overruled.

MR. DORIA:  She signed the document this morning, Your Honor --

THE COURT:  I -- she.  I overruled.

MR. DORIA:  Apologies.  I was going to hand this -- can I hand a document?

THE COURT:  I overruled the objection. It's (indiscernible crosstalk.)

MR. DORIA:  Moving on with my questioning, Your Honor.

THE COURT:  You don't want the witness to answer?

MR. DORIA:  Oh, I a apologize.  I'm sorry. I'm a little bit flustered, Your Honor.

Q.   (Continued by MR. DORIA:)  The last question was why was Marina Hankins omitted from your initial disclosure's witness list?

MS. WALSH:  Objection.  Relevance.

THE COURT:  Sustained.

MR. DORIA:  Didn't you just overrule the question -- the objection, Your Honor?

THE COURT:  So it's a different objection.

MR. DORIA:  Okay.  Can I hand the witness a document, Your Honor, that I would like to introduce?

THE COURT:  No.  We don't do physical -- everything is through the electronic and we'll get it up on the screen.

MR. DORIA:  Okay.

THE COURT:  The witness has her own screen.

MR. DORIA:  Okay.  I would like to take a look and introduce Document No. 1.

THE COURT:  So hold on a second, we have two number ones.  Both parties have a copy of the exhibit and witness list.  This is yours to write on, right.  So you have to refer to it as Plaintiff's 1 or Defendant's one because both parties are allowed to use both sides exhibits and so you need to make sure you are identifying as which one.

MR. DORIA:  Thank you for that, Your Honor. I'm referring to Plaintiff's Exhibit 1.

THE COURT:  Okay.

Q.   (Continued by MR. DORIA:)  This is titled Lease of Daniel Doria.  It's a copy of the lease from

Cottonwood Springs RV --

MS. WALSH:  Objection.  Leading.

THE COURT:  Sustained.

So, Mr. Doria, you have to elicit that testimony from the witness.  You can't testify these foundational questions.  You have to --

MR. DORIA:  I understand, Your Honor.

THE COURT:  -- get the information from the witness.

MR. DORIA:  Understood, Your Honor.

Q.  (Continued by MR. DORIA:)  Are you able to see the lease document there, Julie?

A.  Yes.

Q.  Do you recognize that document?

A.  Yes.  It's an application.

THE COURT:  And I need you speak into the microphone, ma'am.  If you need to move it, you can.

Q.  (Continued by MR. DORIA:)  Could you turn to Page No. 2?

THE COURT:  She can't.  You control the page.

MR. DORIA:  Oh.

THE COURT:  It has not been admitted into evidence yet.

MR. DORIA:  Okay.  So I think the last time

you and I met, Your Honor, you indicated that you needed some verbiage from me to introduce something into evidence.

THE COURT:  So, in every case, if there's no stipulation regarding the admission of exhibits, you have to lay foundation and then you ask for it to be admitted and then I check and see if the other side has any objections.

Now, have you already checked with Ms. Walsh to see if she stipulates to any of your exhibits coming in?

MR. DORIA:  I have, and she's disputed the authenticity of all the documents, Your Honor.

MS. WALSH:  That is not an accurate statement, but we can move on.

THE COURT:  Okay.

MS. WALSH:  I did offer to stipulate to some documents and Mr. Doria declined.

THE COURT:  Okay.  So, Mr. Doria, I didn't -- you can write this down because it's going to be the same for all of these --

MR. DORIA:  Okay.

THE COURT:  -- right.  And I'm going to give you kind of the basics lesson in laying foundation. That does not mean that depending on the document you

might need additional questions, but this will get you started.

Generally speaking, what is the exhibit, right. They can't testify as to the details, just generally. Is it dated and what's the date that's associated with it. If it's you, you would say how did you get the exhibits. But on this one you might scroll through and see if they are familiar with the entire exhibit and whether they can say it's a true and accurate copy or if it has been altered in any way.

That may present some difficulty if your witnesses don't have the information for your exhibits, right, because it's a little difficult because you're not the first witness to lay all this foundation, right, where you got the exhibit from, if you've altered it.

But anyway, you go through and you lay foundation by asking those types of questions. Then you ask for it to be admitted. I'll check with Ms. Walsh to see if we have an objection. If there's no objection, then it gets admitted. If there is an objection, I may issue a ruling or we'll argue it. Okay?

MR. DORIA: I'm going to try my best, Your Honor.

THE COURT: I know it's complicated.

Q.  (Continued by MR. DORIA:)  All right.

Ms. Pendergast, can you tell me what that document is?

A.   What's on the screen is a Cottonwood Springs rental application, what I can see of the top half.

MR. DORIA:  How do I scroll up and down?

THE COURT:  It's a touch pad.  You use the screen.

MR. DORIA:  Oh.

Q.   (Continued by MR. DORIA:)  (Indiscernible) I'm going to scroll through entire document here.  Is the document dated?

A.   I can read, yes, that it says 3/10/2025 with your signature and Marina Hankin.

Q.   And did Marina Hankin sign it and name her title property manager on March 10, 2025?

A.   Yes.

Q.   And it's your testimony that Marina Hankins was mistaken and she was not the property manager, correct?

A.   I consider myself the general manager and property manager, but she is in the office with supervisory level.  So I wouldn't dispute if she used that title --

Q.   Okay.

A.   -- but I am the general manager.

Q.   I understand.  Thank you.

I'm scrolling to Page 3 of the, document.  This

is past the application.  Do you see that page there with the handwritten note at the top?

THE COURT:  Just a second.  To be clear for the record, you're actually on Page 6 of 12.  You see that page number at the top?

MR. DORIA:  It is, Your Honor, but it is Page 3 of the lease.  So she's currently -- Your Honor is correct, it says Page 6 of 12 at the top and at the bottom it says Page 3.

Do you see that next to my initials?

MS. WALSH:  Your Honor, if I may, this is actually two documents and so there are two page threes, so I would ask Mr. Doria to lay foundation for both.

MR. DORIA:  I'm having a hard time getting through these very basic questions, Your Honor.  If they're able to ignore the fact that there's a lease, we're not going to be able to get through the hearing.

THE COURT:  So, Mr. Doria, I just want to make sure that anyone listening back to our record is clear about what exactly, which page you are showing --

MR. DORIA:  Uh-huh.

THE COURT:  -- the witness.  And for that reason, I'm asking if you use the page number that we have listed as that six rather than three.

MR. DORIA:  Okay.  I'll do that, Your Honor.

I apologize.

Q.   (Continued by MR. DORIA:)  Do you see Page 6 of 12?

A.   Yes, I do.

Q.   Do you see a handwritten note directly beneath it?

A.   Yes.  I do see a handwritten -- it looks your writing and your initials on it.

MS. WALSH:  Objection, Your Honor.

MR. DORIA:  Objection, Your Honor.

THE COURT:  The objection is sustained.  We can't really get into these details because it hasn't been admitted yet, right.

MR. DORIA:  Okay.  I'm understand, Your Honor.  So I'm a little bit confused.  Am I supposed to ask her how she got this document?

THE COURT:  So if you were the one, and it was your exhibit, then that is what you would do.

MR. DORIA:  Your Honor, I've named it as my exhibit.

THE COURT:  Since she is your witness, you have to ask her if she's familiar with the entire document and does it appear a true and accurate copy of the lease.  And if she's can't support that, it might be difficult to get this exhibit in through this witness.

MR. DORIA:  Understood, Your Honor.  It seems the procedures have changed since the last time we had an evidentiary hearing in this courtroom.  I apologize.

THE COURT:  Well, Mr. Doria, I don't believe we've had an evidentiary hearing on a civil matter before.

MR. DORIA:  (Indiscernible) Your Honor.

THE COURT:  Okay.  Well, anyway, Mr. Doria, that's how it works.

MR. DORIA:  Understood, Your Honor.  So I have no clue where I'm at.  We have a witness that verified what this document is.  She verified the date.  She didn't get the document, I got it.  Can I introduce this as an exhibit?

THE COURT:  You can offer it and I can check with Ms. Walsh --

MR. DORIA:  Okay.

THE COURT:  -- to see if there are any objections.

MR. DORIA:  Okay.  I would like to introduce this lease document that's labeled lease as Exhibit No. 1, Plaintiff's.

THE COURT:  Ms. Walsh, any objection?

MS. WALSH:  Yes, Your Honor.  It lacks

foundation.  Again, this is two documents.  He's laid foundation for the application, but not for the lease agreement itself.

So if he wants to introduce pages one and two of the document that he's laid foundation for, we'd have no objection to that.  (Indiscernible crosstalk.)

MR. DORIA:  (Indiscernible crosstalk) Page 6 of 12, Your Honor.

THE COURT:  Hold on.  Hold on.  Hold on, Mr. Doria.

MS. WALSH:  I believe more foundation needs to be laid for the lease agreement which is the second document in this set.

THE COURT:  Okay.  So, Mr. Doria, what she's saying is that there's no objection to Pages 1 and 2, but that she doesn't have the foundation for the additional exhibits.

Would you like to have me rule on it or lay additional foundation?

MR. DORIA:  I'm going to lay additional foundation on it.  I think I understand.  I was just shocked that you permitted that.  I'll go ahead and try to lay additional foundation.

Q.  (Continued by MR. DORIA:)  Do you see the document on the screen here?  Does any of what is coming

on the screen look like a lease to you from Cottonwood Springs, the document that you stated that was signed?

A.   So I see a partial of an application and then some of the scrolling sheets are a separate document --

Q.   Okay.

A.   -- which would be referred to as the lease.

Q.   Is this Page 1 of the lease?

A.   I can't see unless I see the entire user scrolling.

Q.   Can you put your glasses on, please?

A.   I can see it, but I'm just seeing sentences. There are some things in the application of the lease that yes, this would look like -- this part would be a portion of the actual (indiscernible crosstalk).

Q.   You are the general manager for Cottonwood springs, correct?

A.   Absolutely.

Q.   So you know what the leases look like?

A.   Yes.  (Indiscernible crosstalk.)

          MS. WALSH:  Objection, Your Honor. (Indiscernible conversation).

          THE COURT:  Stop.

          MR. DORIA:  Your Honor, I'm trying to be productive here.

          THE COURT:  Hold on.  You are going too

fast.  You need to make sure this witness is done answering before you ask the next question.

Q.  (Continued by MR. DORIA:)  Does this look like a lease from Cottonwood Springs and is it signed by me?

MS. WALSH:  Objection.  Compound question.

THE COURT:  I will allow the question.

Q.  (Continued by MR. DORIA:)  Do you need me to scroll through the whole document?

A.  Can you please ask your question again?

Q.  Is this a Cottonwood Springs lease R- -- Cottonwood Springs RV lease, yes or no?

A.  The portion that you started it, yes.  I don't have --

Q.  I'm going to start from the top.

THE COURT:  Well, hold on a second.  Ma'am, I need you to speak into your microphone.

Q.  (Continued by MR. DORIA:)  I'm starting from the top of what you claim is the separate document.  It starts with the Rules and Regulations Listed Below.

Does this look like a lease from Cottonwood Springs RV?

A.  Back in March, yes.

Q.  Back in March?

A.  Yes, sir.

Q.  Okay.  And is this document dated?

A.   You're scrolling.  Which part?

Q.   Have you seen this document before?

A.   Yes.

Q.   Was it dated before you saw it?

MS. WALSH:  Objection, Your Honor.
Badgering the witness.

THE COURT:  Sustained.  You keep asking
multiple questions before (indiscernible crosstalk).

Q.   (Continued by MR. DORIA:)  Have you seen this
document before?

A.   Yes.

Q.   Okay.  Was it dated then?

A.   I have seen your lease agreement with the park
that did have a signature and certainly dates on it.

Q.   So are you --

A.   Mr. Doria (indiscernible crosstalk).

Q.   (Indiscernible crosstalk) this is my lease
agreement?

MS. WALSH:  Objection.  Misstates testimony,
badgering the witness.

MR. DORIA:  Your Honor, if I can't ask basic
questions and get basic answers to these simple
questions, this is -- I mean, respectfully this is not
an injunction hearing.  I need to ask a question and get
an answer.  She knows what the question is.  If she

doesn't want to answer the question, she can just say I refuse to answer the question.

THE COURT:  Hold on a second.  It is an injunction hearing, so I don't understand that part of what you just said.

MR. DORIA:  Why -- why -- and I have the right to ask these questions and I need answers to these questions.  If they're allowed to do this constantly certain the legal volley with the verbiage back and forth and we can't even establish in the first half hour that this is my lease, it won't be a productive hearing.

THE COURT:  So what I will tell you, Mr. Doria, is that if this document contains -- this exhibit contains multiple documents, then it takes a little more complex in going --

MR. DORIA:  Understood, Your Honor.

THE COURT:  -- through.  But I also need -- you've asked this witness multiple questions without letting her answer, I need you to slow down these questions.

MR. DORIA:  I don't think I've asked any questions without allowing her to answer, Your Honor, but I'll go ahead and ask again.

Q.   (Continued by MR. DORIA:)  Does this look like the lease that Cottonwood Springs RV signed for me on

March 10 of 2025?

A.   So so far I haven't seen the entire lease.  You look like you're on Page 8 of 10.  Is that the final part of --

Q.   That looks like Page 5 of the lease.  Do you see that Page 5 at the bottom there, do you see where it says Page 6?

A.   Right.  So we're still scrolling.  This is the first time (indiscernible crosstalk) --

Q.   Are you disputing that this is a lease that you guys signed for me --

THE COURT:  Hold on, a second Mr. Doria.

Q.   (Continued by MR. DORIA:)  On March 10?

THE COURT:  Hold on.  Hold on.  What this witness is asking for is for you to scroll through the entire thing first so that she can take a look at it.

THE WITNESS:  So yes, as you've gotten to the final page, if you go up a little bit because you went so fast, that looks like what would be the final page of the lease, yes.

Q.   (Continued by MR. DORIA:)  I'm going to ask one more time.  Is this the lease that Cottonwood Springs RV signed for me on March 10, 2025?

A.   This is the lease agreement, yes, that I followed up and was in your file --

Q.   Okay.

A.   -- as the (indiscernible crosstalk).

Q.   I'm going to move back to Page 3 of the lease that I think is labeled 6 of 12 in this exhibit.

MR. DORIA:  Your Honor, have we admitted this as an exhibit yet?

THE COURT:  No.

MR. DORIA:  Your Honor, can we admit this as an exhibit now that the witness has verified this is my lease?

THE COURT:  Ms. Walsh, any objection?

MS. WALSH:  No objection.

THE COURT:  Petitioner's -- sorry Plaintiff's Exhibit 1 is admitted.

MR. DORIA:  I'm going to ask -- looks like I believe that the bailiff is moving things around.  I'm going to wait until he's done.

THE COURT:  No.  We don't have control of the screen yet.

MR. DORIA:  It's just me now?

THE COURT:  It has been.

MR. DORIA:  It's been jumping to the top. It did it four times, so. . .

THE COURT:  We have no control over that, Mr. Doria.

Q.   (Continued by MR. DORIA:)   Okay.   Do you see this document that says Page 3 at the bottom, Page 3 of the lease that you just verified?

A.   Yes.

Q.   Do you see the handwritten note at the top that says:  Lessee babysits up to four dogs at a time, typically one to two?

A.   Yes.

Q.   Is that signed by Marina Hankins?  It's a yes or no question.

A.   Are you talking about your initials are you talking about (indiscernible crosstalk) --

Q.   No.  This lease.

A.   -- (indiscernible crosstalk).

Q.   This lease document.  Let me scroll to the page where she signed to help.  This is that lease.

A.   Yes.

Q.   Okay.  So to confirm, Marina Hankins signed my lease that allowed me to babysit up to four dogs; is that correct?

             MS. WALSH:  Objection.  Leading.

             THE COURT:  Sustained.

             MR. DORIA:  That isn't leading, Your Honor. How is that leading?  I asked a very simple question.

Q.   (Continued by MR. DORIA:)  This document is

signed by Marina Hankins, correct?

THE COURT:  (Indiscernible crosstalk) objection.

Q.  (Continued by MR. DORIA:)  This lease is signed by Marina Hankins, correct?

A.  Yes, sir.

Q.  In that same document in that handwritten note on Page 3 permits me to babysit dogs; is that correct?

A.  Will you ask your question again?

Q.  Why don't you read that note to me at the top that you said you saw.

A.  What's your question, sir?

Q.  Read the note at the top of that lease document.

MR. DORIA:  Your Honor, she's looking to her lawyer --

THE WITNESS:  I'm looking --

MR. DORIA:  -- tell her what to do and say.

THE COURT:  Hold on.

MR. DORIA:  And this is --

THE COURT:  Mr. Doria, hold on.

Ma'am, he asked you to read the section in this admitted exhibit, if you would please do that.

THE WITNESS:  Lessee babysits up to four dogs at one time, typically one, dash, two, and then DT PDT or whatever the initials are.

Q.   (Continued by MR. DORIA:)   Now I'm going to scroll back to the bottom of that lease.  Again, that lease that contains that provision was signed by Marina Hankins, correct?

A.   Yes, sir.

Q.   Thank you.  In Paragraph 6 of the answer that you admitted that the lease contains a written provision, is that the written provision that you were referring to when you signed that document?

A.   I don't understand the question.  What --

Q.   The document that you verified that you signed earlier, the answer, in Paragraph 6 of that answer, you admitted that the lease contained a written provision regarding pets.

Is this the provision that you were referring to when you signed that document?

MS. WALSH:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Can I get a copy of what you are talking about?  You are asking me (indiscernible crosstalk).

Q.   (Continued by MR. DORIA:)   I'm just asking you to recall from memory --

A.   (Indiscernible) I'm confused.

THE COURT:  You just answer if you know and

you don't know, then you would say you don't know.

THE WITNESS:  I don't know.

Q.  (Continued by MR. DORIA:)  Okay.  If the lease explicitly authorizes pet sitting, why did you issue an eviction notice citing baby sitting numerous dogs as a material breach?

A.  This lease began in March and it ended in June, so --

Q.  Thank you.

A.  -- this lease expired.

Q.  Thank you.

Let's go back to the lease.  I'm going to look at Page 2.  I just want to address that comment about the lease expiring and not continuing.

Will you please read the entirety of Paragraph 3 for me?

A.  The terms of this agreement shall commence on the day written above in Paragraph 1 effective date and end on 9th day of June 2025.  Unless terminated by either party after the expiration, the initial term of this agreement shall automatically continue to a currently monthly rate basis.  No rate is subject to change from the initial rental agreement.

Q.  Is it still your claim that the lease expired and did not continue?

A.   Yes, sir.

Q.   Thank you.

A.   The paragraph to begin with above that says --

Q.   Thank you.  I appreciate that.

Can you point to any document where I agreed to remove this authorization prior to November 2025?

A.   Yes, sir.

Q.   Where is that document?

A.   As I was stating above number one, it states that --

Q.   Is there a separate document --

A.   It's this document.

Q.   -- that removes this lease provision?

A.   It's this document.

Q.   So you are saying the same document removes the lease provision that the same document provides for?

A.   Are we talking about the dogs or are we talking about the rollover --

Q.   We're talking about the dogs.

A.   No.  There isn't anything in this lease agreement.

Q.   Okay.  Thank you.

In your disclosure statement you claim that I was leaving dog feces everywhere and verbally accosted staff; is that correct?

A.   Yes, sir.

Q.   Are you referring -- when you say verbally accosted staff, are you referring to when I called you -- can I swear or should I swear, Your Honor?  I don't --

THE COURT:  If it's a quote, it's allowable.

MR. DORIA:  It is.

Q.   (Continued by MR. DORIA:)  Are you referring to when I called you a criminal and a cunt?

A.   That was certainly some of the language that I would be referring to.

Q.   Is it your opinion that that language is incurable?

MS. WALSH:  Objection.  Calls for speculation.

MR. DORIA:  She's the general manager, Your Honor.  She makes these decisions.

THE COURT:  Overruled.

THE WITNESS:  Your question again, sir?

Q.   (Continued by MR. DORIA:)  Is it your opinion that calling you a criminal and a cunt is incurable behavior as far as a material lease breach?

A.   I consider it to be aggressive along with other things that --

Q.   That wasn't my question.

A.   -- not single --

Q.   Is it incurable?

A.   Yes, sir.

Q.   I believe the law disagrees.

THE COURT:  Hold on.  You cannot comment on the testimony.

MR. DORIA:  I apologize.

THE COURT:  Next question.

MS. WALSH:  And we would move to strike as well.

THE COURT:  That is granted, the comment.

Q.   (Continued by MR. DORIA:)  I've lived here since March of 2025.  Can you produce a single written warning or notice to cure sent regarding dog feces between March and October of 2025?

A.   I personally didn't, but I have staff that will --

Q.   That would be hearsay, but can you produce anything or are you aware of anything that you can specifically speak to here today?

A.   I've had a verbal conversation with you about your feces and not picking it up.

Q.   You have?

A.   Yes.

Q.   Okay.  Was that conversation recorded?

A.   I don't have a recording of it.

Q.   Was that conversation the one that you claimed to me was recorded, the same one where I called you a cunt?

A.   No.  It was not during (indiscernible crosstalk) --

Q.   So you are claiming we've spoken more than twice?

THE COURT:  Hold on.  She's still answering the question.

Q.   (Continued by MR. DORIA:)  You are claiming it was a separate phone call?

A.   It was a separate phone call.

Q.   Do you have any records of those phone calls?

A.   In my history.  I would have to go back and I'm sure I could produce records.  (Indiscernible crosstalk).

Q.   That's all I was asking for.  Okay.

A.   Just the record, not the --

THE COURT:  I need you to not talk while she's continuing to talk.  It screws up the record, Mr. Doria.

MR. DORIA:  I apologize, Your Honor.  I'm so flustered.

Q.   (Continued by MR. DORIA:)  Can you show a single police report relating to the threatening behavior that you reference?

Q.   Did you file a police report?

A.   No, I didn't, sir.

Q.   If it was so threatening, why didn't you file a police report?

A.   After 30 years of being a law enforcement officer --

Q.   Uh-huh.

A.   -- quite frankly, I couldn't waste the law enforcement's time (indiscernible crosstalk) --

Q.   So that's your --

A.   -- on that, my personal opinion, so that's why I personally did not do that.

Q.   Okay.  So you did not file any police report or seek any type of protection from anyone when you felt --

A.   Just --

Q.   -- threatened by me?

A.   I did seek it because I came (indiscernible crosstalk) --

Q.   From who?

A.   Well, I served you a notice afterward of the disorderly and aggressive behavior.  I did submit that.

          MR. DORIA:  Understood.

          Your Honor, the witness has just introduced a document --

          THE COURT:  Hold on.

MR. DORIA:  -- herself?

THE COURT:  Hold on.  Hold on.  I need you to make sure you're pacing this better because you are still interrupting her testimony.

Okay.  You wanted to say something to me, Mr. Doria.  What was that?

MR. DORIA:  The witness just opened the door to the note -- the first notice to vacate, Your Honor. So based off of her opening the door, I'd like to introduce as Exhibit No. 2 the first notice to vacate that prompted this hearing today.

You want to try?

THE COURT:  Are you asking for the admission of Plaintiff's Exhibit 2?

MR. DORIA:  Hold on a minute.  I'm trying to be better at my job here.

Q.   (Continued by MR. DORIA:)  Is this the document you're referring to, Ms. Pendergast?

A.   Yes.

Q.   And when did this document --

THE COURT:  Hold on.  You haven't referred which document is she looking at.

Q.   (Continued by MR. DORIA:)  Let me show you the whole document before I ask you what it is.

THE COURT:  I need the number.  Plaintiff's

exhibit number what?

MR. DORIA:  Plaintiff's 5, Your Honor.  I apologize.

Let me know if you want me to scroll back up.  I'm trying to scroll, Your Honor, but it keeps jumping to the top of the page.  And so I thought there were other controls here, so I'm going to do my best.

THE COURT:  (Indiscernible crosstalk) your paper was touching the screen and that was affecting it.

MR. DORIA:  Okay.

THE COURT:  You're the only one controlling any of it.

MR. DORIA:  All right.

Q.  (Continued by MR. DORIA:)  Before I ask you questions about this document, would you like to see any portion of it for any longer period of time?

A.  No.  That re-familiarizes myself with the document.

Q.  Okay.  What is this document?

A.  It's titled Notice of Material Irreparable Breach, Notice to Move.

Q.  At the bottom of that page, what law is cited?

MS. WALSH:  Objection, Your Honor.  He's asking questions about an exhibit that has not been admitted.

THE COURT:  Sustained.

MR. DORIA:  Oh, understood, Your Honor.  Can I admit this document?

Q.  (Continued by MR. DORIA:)  Is this an original document?  Does it appear to be edited by me in any way?

A.  No, sir.

Q.  I'll go through it one more time?

A.  No.  It does not.

Q.  Okay.  And did you maybe issue document or did you have one of your agents issue it?

A.  I handled it myself.

MR. DORIA:  Okay.  Now may I introduce this exhibit as Plaintiff's No. 2, Your Honor?

THE COURT:  Any objection, Ms. Walsh?

MS. WALSH:  No objection.

THE COURT:  Plaintiff Exhibit 5 [as spoken] is admitted.

Q.  (Continued by MR. DORIA:)  Was I given any opportunity to cure any of these or did you just issue the notice?

A.  I issued a notice after a lengthy phone call with you to discuss many of the outstanding issues that ended in what you've already disclosed with this inappropriate language, name calling, derogatory, and aggressive hostile I would call it.

Q.   Okay.   Was this the only notice to vacate that you issued?

A.   We've had other conversations where you would be moving out.   I'm answering your question.

Q.   Did you issue other documents, notices to vacate; or did you have your other agents issue additional documents, notices to vacate?

A.   No.   Just verbal conversations with you numerous times --

Q.   Okay.

A.   -- that would you would be vacating.

Q.   Okay.

MR. DORIA:   Your Honor, what's the technical -- if I'm going to impeach the statement, is there some specific procedure to say to introduce another document to impeach a false statement under oath?

THE COURT:   So what I would say, Mr. Doria, is that you're still going through the exhibits --

MR. DORIA:   Uh-huh.

THE COURT:   -- right, with this witness. I'm keeping track of the time.   You are currently at a half hour in for your presentation.

So you can bring up the exhibit and you can lay foundation and you can ask for it to be admitted and

you just --

MR. DORIA:  Okay.

THE COURT:  -- keep going.

MR. DORIA:  Understood.

Q.  (Continued by MR. DORIA:)  So just to be clear before we move anything further forward, to your knowledge there were no other notices to vacate issues other than this one, correct?

A.  I cannot speak on behalf of other parties, meaning other office (indiscernible crosstalk) --

Q.  It's your property.

A.  -- and what they -- I can't speak on behalf.  I am not a full-time person there.  I'm a general manager, so I have people working there.  This is --

Q.  So you --

A.  -- I can -- I can give you testimony that I hand wrote that this day.  As of all the notices --

Q.  Okay.

A.  -- I had a manager that I fired and other people --

Q.  I think I understand.

A.  -- I can't speak on behalf of them.

Q.  Thank you.  I think I understand.

To your knowledge, no other notices to vacate were issued?

A.   You --

Q.   To your knowledge?

A.   Before this?

Q.   After this.

A.   Oh.   Notices have been given --

Q.   Okay.

A.   -- after this.   Yes, sir.

Q.   Okay.   That was the question I was asking.

A.   Okay.   Sorry.

Q.   At the bottom of this document, there's a law cited giving you the power to kick me out of that home. What is that law?

It's starts with ARS.   Do you see it there?

A.   Are you asking me to read --

Q.   Uh-huh.

A.   -- what's on the notice?

Q.   Yeah.   The document that you signed telling me I need to leave immediately, you --

A.   I --

Q.   -- used a law to do it.

A.   There's an ARS statute listed here --

Q.   Right.

A.   -- 33, dash, 1368, parentheses --

Q.   Okay.

A.   -- three subsection.

Q.   Okay.  So just to be clear, when you wrote this letter, you were attempting to use the power of that law to get me out of that property, correct?

A.   I was attempting, yes, to have a process to follow.

Q.   Was that the correct law?

MS. WALSH:  Objection.  Calls for a legal conclusion.

Q.   (Continued by MR. DORIA:)  Do you have training --

THE COURT:  Hold on.  Sustained.

MR. DORIA:  I apologize, Your Honor.

THE COURT:  You can ask your next question. I ruled on the objection.

Q.   (Continued by MR. DORIA:)  Do you have training in the Arizona Recreational Vehicle Long-Term Rental Act?

A.   As a general manager and as a law enforcement officer for 30 years, I have general knowledge, general.

Q.   Okay.

A.   Yes.  Not an expert, but general.

Q.   So why did you issue an eviction notice citing the wrong law?

MS. WALSH:  Objection.  Called for a legal conclusion.

MR. DORIA:  She cited it.

THE COURT:  Hold on.

MR. DORIA:  She cited it.

THE COURT:  Hold on.  Mr. Doria --

MR. DORIA:  It's (indiscernible crosstalk).

THE COURT:  Hold on.  No one is disputing that that's what's listed.  What is being disputed in this objection is this witness's ability to make the legal determination.

The objection is sustained.

Q.  (Continued by MR. DORIA:)  Going back to the question about other people issuing notices to vacate, is it possible that I've received ten notices to vacate without your knowledge?

Is it possible?  Yes or no?

A.  I think your question that I --

Q.  This's a yes or no question.

MS. WALSH:  Objection.  Badgering the witness.

MR. DORIA:  Your Honor --

THE COURT:  Hold on.  Sustained.  Go ahead.  Ask --

MR. DORIA:  They're turning this two-hour hearing into a ten-hour hearing, Your Honor.

THE COURT:  (Indiscernible crosstalk).

MR. DORIA:  I'm not going to be able to make my case, that's right.

THE COURT:  Hold on.  I need you to -- so, Mr. Doria, this is one of the difficulties in having witnesses starting out with one that's not yourself, right, where you can control the pacing.  So I need you to ask the question and I understand that sometimes witnesses (indiscernible crosstalk) --

MR. DORIA:  I'm going to try to fly through these, Your Honor, so that I can be a little bit more productive and stop wasting the court's time and everyone else's time here, all right?  I'll do my best to just fly through.

Q.   (Continued by MR. DORIA:)  Is it your claim that I agreed to move out on January 9th?  Yes or no?

A.   Yes.  Yes.

Q.   Okay.  When did I make that offer?  Before or after the notices to vacate?

A.   Which notice?  You talking --

Q.   This notice?

A.   (Indiscernible crosstalk).

Q.   Did I say I would move out before on after?

A.   (Indiscernible crosstalk).

THE COURT:  Hold on.

MR. DORIA:  She asked the question.  I'm

clarifying.

THE COURT:  You're talking over each other. You can't talk at the same time.  Go ahead ask the question, Mr. Doria, ut you can't interrupt her or the record gets nobody.

Q.  (Continued by MR. DORIA:)  Did I -- did I make the offer to move out before or after you told me to move out immediately?

A.  You've made several verbal.  The one that you gave me in writing would be subsequent following this notice here and (indiscernible crosstalk) --

Q.  So to clarify, when I offered to move out January 9th, it was after you told me that I must move out immediately?  Yes or no?

A.  Yes.

Q.  Thank you.

The November 20th notice threatening that an eviction notice may be or has been filed against me; is that correct?

A.  I'm going to make an assumption that yes, I'm not looking at -- I'm not looking at the document.

Q.  Just to confirm, you said you were in law enforcement for 30 years, right?

A.  Yes, sir.

Q.  Okay.  Okay.

A.    Yes, sir.

Q.    Is this your first time you've testified under oath?

A.    Absolutely not, but I usually --

Q.    Of course not --

A.    -- don't give testimony without having --

THE COURT:  Hold on.

THE WITNESS:  -- documents in front of me.

MR. DORIA:  That's a good question.

THE COURT:  Hold on.  Hold on.  I need both of you to stop talking when the other person is talking.

Q.    (Continued by MR. DORIA:)  That same document also stated your landlord wants you to move out now and return the keys immediately; is that correct?

A.    Which document are we talking about (indiscernible crosstalk)?

Q.    The notice to vacate.

A.    That's up on the screen right now?

Q.    Yes.

MS. WALSH:  I would just ask that he show her the document that he's asking her questions about.

MR. DORIA:  I just want to note for the record I've showed this document five times now.

THE COURT:  Hold on a second, Mr. Doria.

MR. DORIA:  I've scrolled up and down the

same document --

THE COURT:  (Indiscernible crosstalk).

MR. DORIA:  -- five times.

THE COURT:  -- a proposal for you to show the witness the section that you are asking them to verify.

Q.   (Continued by MR. DORIA:)  I'm going to put it on the center of the screen.

A.   Yes.  So I can now see now that that block underneath which is in the center of the form says eviction action may be or has been filed against you. Yes.  That is part of that (indiscernible crosstalk) --

Q.   Did you not know whether one had or hasn't been is that why you said has or maybe has been?

A.   I was unclear what document you are talking.  I don't give testimony in my -- without looking at what you're talking about.

Q.   You just read it.  You just read it.

A.   I still want to give testimony on a document of what we're talking about (indiscernible crosstalk) --

Q.   Why don't you read that paragraph in the gray box?

A.   You want me to read it out loud?

Q.   Yeah.

A.   An eviction action may be or has been filed

against you.  If an eviction action has been filed, you have the right to appear in court to dispute the eviction action.  After hearing, the judge will decide if you have to move or if you legally stay in the rental.  If the judgment is entered against you, a writ of restitution, a court order to have you removed from the rental may be issued between 12 to 24 hours from the date of judgment is signed and you may be required to pay damages, attorney's fees, and court costs.

Q.   On that date, had you sued for eviction?

A.   No.  I had not --

Q.   Yes or no?

A.   -- taken any action.

Q.   So is it fair to say that the purpose of that letter was to scare me?

A.   No, sir.

Q.   What was the purpose?  Just to get me to move out immediately without any fear?

A.   You -- it was --

Q.   Okay.

A.   -- to have you moved out as you agreed upon numerous times before.

Q.   Okay.  Did you receive an email from me on December 11th, titled cured breaches complete?

A.   I may have, sir.  Can I see it up on here just to

see what you are talking about, sir?

Q.   No.   I'm going to ask you to recall from memory if you got something like that from me or not saying that any breaches that were alleged had been cured.

A.   Unknown.  I don't know.

Q.   Okay.

A.   I can't answer that.

Q.   Did you and your staff inspect Site 177 after receiving the email to verify that the dogs were gone?

A.   Unknown.  I don't know.

Q.   If you didn't inspect the site, how did you know the breach was not cured?

I'll keep moving.  Why did you reject my offer to do a background check and sign a new lease provided that I could still babysit dogs?  Was it because I called you those names?

A.   You've never been willing to abide by our current agreement which is, yes, it is a background, a new lease, and we cannot allow up to four to six dogs.  We cannot have more than two personal dogs.  So no, I could not sign that and have that because that's not something for health and safety or something that we can do in the park.

Q.   Are you saying that there's some type of law that prohibits you from honoring that modification of my

lease, a health and safety law that you are aware of?

A.   I don't know what you mean modification.  This is a lease that expired in June, it's month to month --

Q.   You saw --

A.   - I wouldn't sign (indiscernible crosstalk) --

Q.   -- notification --

A.   -- lease.

MR. DORIA:  Your Honor, she's -- she's --

THE COURT:  Hold on.

MR. DORIA:  I'm trying not to --

THE COURT:  Hold on.

MR. DORIA:  -- (indiscernible crosstalk) her own testimony.

THE COURT:  And you're talking over each other.  So --

MR. DORIA:  She testified --

THE COURT:  (Indiscernible crosstalk) --

MR. DORIA:  -- earlier that there was a note in the lease, Your Honor.  Now she's pretending not to recall the note and so now we're having to backtrack and lose time.

THE COURT:  (Indiscernible crosstalk) --

MR. DORIA:  All I'm asking for is an efficient --

THE COURT:  Mr. Doria, I wanted to make a

comment to you.  You are at 40 minutes and I didn't start the time until we started with the substantive hearing, right.  Our preliminary issues are not counting toward anyone's time.  You may want to testify and if you do --

MR. DORIA:  I do, Your Honor.

THE COURT:  (Indiscernible crosstalk) --

MR. DORIA:  I understand, Your Honor.  I do want to testify.  I'm not the one that is allowing this to happen.

THE COURT:  No.  What I'm saying is that each party --

MR. DORIA:  Okay.  I'm going to --

THE COURT:  -- gets an hour.

MR. DORIA:  I'm going to go ahead and be done questioning this witness and I'll question myself, Your Honor.

THE COURT:  All right.  Cross examination?

MS. WALSH:  Yes, Your Honor.

THE COURT:  And are you connected or do we need to move the iPad?

MS. WALSH:  I am connected.

THE COURT:  Okay.  David do you need to change the controller?

Go ahead, Ms. Walsh.

MS. WALSH:  Okay.

CROSS-EXAMINATION

By MS. WALSH:

Q.  Just a couple of follow-up questions on this Exhibit 5.  This is Plaintiff's Exhibit 5.

At this time, Mr. Doria was month to month; is that correct?

A.  Yes.

Q.  And --

MR. DORIA:  Objection, Your Honor.

THE COURT:  What's your objection?

MR. DORIA:  Relevance.  I'm not understanding where the relevance is.

THE COURT:  Overruled.

Q.  (Continued by MS. WALSH:)  And you didn't take action on this immediate eviction notice, did you?

MR. DORIA:  Objection.  Testifying for the witness, Your Honor.

THE WITNESS:  I did not.

THE COURT:  Hold on.  Hold on.  This is cross-examination --

MR. DORIA:  I understand.

THE COURT:  -- so she's allowed to ask leading questions.

MR. DORIA:  Is she allowed to testify for

the witness?

THE COURT:  She's allowed to ask leading questions.  The objection is overruled.

Q.  (Continued by MS. WALSH:)  I'll ask my question again.  You didn't take action on this; is that correct?

A.  No.  I did not.

Q.  Okay.  And going back in time a little bit, you were changing some of the park rules; is that correct?

A.  Yes.

Q.  And --

MR. DORIA:  Objection, Your Honor.

THE COURT:  What's your objection?

MR. DORIA:  Relevance.  It's got nothing to do with this.

THE COURT:  Overruled.

Q.  (Continued by MS. WALSH:)  And you were seeking compliance with these change in rules of all of the park residents; isn't that correct?

A.  Yes.

Q.  And --

MR. DORIA:  Objection, Your Honor.  Foundation.

THE COURT:  Overruled.

Q.  (Continued by MS. WALSH:)  And those communications with the residents included Mr. Doria; is

that correct?

A.  Yes, ma'am.

Q.  And you had sought Mr. Doria to sign a new lease; is that correct?

A.  Yes, ma'am, when his expired in June.

Q.  And if he had demanded a year-long lease, is that something the park could accommodate?

A.  No.  We cannot do any more than three months signed leases at a time.

Q.  Okay.  And if he had demanded that he continue a dog watching business in his space, is that something you could accommodate?

A.  No, ma'am.

Q.  And you've had problems with Mr. Doria not cleaning up after the dogs; is that right?

A.  Yes.  We've had some complaints.

Q.  And going to Exhibit 1 that has been admitted --

THE COURT:  Plaintiff's Exhibit 1?

Q.  (Continued by MS. WALSH:)  Plaintiff's Exhibit 1, thank you.

-- down here at the bottom of page -- let's see it's 4 of 12 of this document.  It says that no pet shall be left untied or left outside; is that right?

A.  Yes.

Q.  And has Mr. Doria ever left his pets, to your

knowledge, unleashed outside in his space?

A.   Those complaints weren't directly to me, no.

Q.   To your knowledge has anyone complained about his pets to your management?

A.   Yes.

Q.   Okay.  On -- okay.  You had indicated that Mr. Doria had verbally stated that he would vacate; is that correct?

A.   Yes.  I had a conversation with him after I fired the Marina, one of my office staff.  We're a relatively new park, and so we have gone through obviously changes as the park as gotten filled up.

I was made aware of this after he did not come in and sign.  It expired in June.  We cannot have leases more than 90 days, which is stated in the first paragraph.  And so, I reached out to him to say, "Hey, your lease is expired, I see the provision month.  I can't do month to month.  You need to come in."

MR. DORIA:  Your Honor --

THE COURT:  Hold on.  Hold on.

THE WITNESS:  And asked him --

THE COURT:  Hold on.  We need to address the objection.

MR. DORIA:  I -- this is a narrative testimony.  Is that a question?

THE COURT:  The objection -- the objection is sustained.

Q.  (Continued by MS. WALSH:)  Okay.  So you had fired your manager; is that right?

A.  Yes, ma'am.

Q.  And you had sought that the residents comply with certain rules, and one of those rules was they needed tod have a current lease agreement; is that right?

A.  Yes, ma'am.

Q.  And up until the notice you issued on November 20th, had Mr. Doria agreed to sign a new lease agreement?

A.  There were two conversations.  The first one I had he was thinking about options because I told him I could not extend having a provision where he could have run a business with additional dogs.  And then he came to the conclusion that he was going to seek somewhere else to live because he did want to be able to continue babysitting and that he would move from the park.

Q.  In fact, he outright refused to sign a new lease agreement; isn't that right?

A.  Following that conversation when he stayed and we kept notifying him that we needed these things, then he would just respond, "I'm not signing anything and I'm not going to do anything."

Q.   And Mr. Doria terminated his lease agreement in writing; isn't that right?

A.   Yes.  He sent an email indicating that he would be vacating January 9th and then he emailed asking for potentially leaving before then and being prorated.

Q.   Okay.  I am showing you what's been premarked as Defendant's Exhibit 16.  Can you see that on your screen there?

A.   Yes, ma'am.

Q.   And can you tell me the date up at the top?

A.   November 23rd, 2025.

Q.   And who is this -- generally speaking, what does this exhibit look like?

A.   An email from Mr. Doria to our office staff.

Q.   And does this look like -- I'm going to scroll down here to the bottom.  Does this look like a true and correct copy of this email?

A.   Yes.

Q.   Okay.

            MS. WALSH:  At this time, I'd move to admit Defendant's Exhibit 16.

            THE COURT:  Mr. Doria, any objection?

            MR. DORIA:  Yeah.  Relevance, Your Honor.

            THE COURT:  The objection is overruled. Defendant's 16 is admitted.

Q.   (Continued by MS. WALSH:)   Okay.   And it says, as you've just testified, right here that, "I'm coordinating to move out for my final paid date January 9th, 2025."   Is that correct?

A.   Yes, ma'am.

Q.   And do you remember responding via email that you accept this move-out date?

A.   Yes.

Q.   And would you recognize that email if I showed it to you?

Let me see if I can show it to you.   Okay.   Is that -- would you recognize this email if I showed it to you?

A.   That was a response following my response, so it may be further down.

Q.   Okay.   So --

THE COURT:   And, Ms. Walsh, I'm going to need, when you get the right exhibit, to make sure you're referencing the exhibit number for the record.

MS. WALSH:   I'm showing the witness what has been marked as Defendant's 18.

Q.   (Continued by MS. WALSH:)   Generally speaking, what does this look like?

A.   This is his response that I replied that I accepted his termination of the month-to-month and he

replied --

Q. Hang on. Before we get into the contents of it, I just wanted to make sure to lay some foundation.

A. Yes.

Q. What's the date there up at the top?

A. November 25th, 2025.

Q. And you had stated that this is an email from Mr. Doria; is that correct?

A. Yes, ma'am.

Q. Okay. And down here we have another date. Can you read that date to me?

A. November 23rd, 2025.

Q. And that's just another email from Mr. Doria; is that correct?

A. Yes. In between, if you scroll up, was my initial response right there.

Q. And can you read the date for that on there for me?

A. It was November 25th.

Q. Okay. Does this look like a true and correct copy of this email exchange?

A. Yes, ma'am.

MS. WALSH: Okay. I move to admit Exhibit 18 into evidence.

THE COURT: Any objection, Mr. Doria?

MR. DORIA:  Relevance, Your Honor.

THE COURT:  The objection is overruled. Defendant's 18 is admitted.

Q.  (Continued by MS. WALSH:)  Okay.  And here, on November 25th, you stated we acknowledge and accept your notice to terminate your monthly lease; is that correct?

A.  Yes, ma'am.

Q.  And Mr. Doria replies and says my move out date is January 9th, 2026; is that correct?

A.  Yes.

Q.  All right.  And he reaffirms that you'll prorate the rent if you move out early; is that right?

A.  I agreed to that in our communication that if he moved out in advance, I would give him whatever credit he had.

Q.  Okay.  What violations, if any, did Mr. Doria commit of park rules?

A.  Having to do the animals and the feces.  And our RV parks are very small, so it's --

MR. DORIA:  Objection, Your Honor.  The purpose of this injunction is to stop an illegal eviction.  It's not to stop a legal eviction.

If there's a breach of a lease term, they still have the power to do it.  We're talking about lease terms that are completely irrelevant to this

injunction protection.

THE COURT:  Hold on a second.  Your specific request in your temporary order and preliminary injunction was for a court order preventing any eviction action, lockout, or disturbance of tenancy until a full hearing on the merits can be held.

MR. DORIA:  I believe it without good cause, Your Honor.

THE COURT:  So if you want to see your motion, I can have my bailiff hand it to you.  Are you narrowing the scope of what you are requesting?

MR. DORIA:  Ye- -- Your Honor, I apologize.  It should have only ever been seeking protection against an eviction not for good cause.

If they want to try to evict with good cause, then we'll cross that bridge when we come to it.  I simply wanted maintenance of status quo.  That's why I'm confused that we're talking about a whole bunch of other things.

THE COURT:  So the reason that we're talking about a whole bunch of other things is because you have a blanket request for all evictions in your temporary --

MR. DORIA:  I see that now, Your Honor.

THE COURT:  (Indiscernible crosstalk) request.  So to your question, Mr. Doria, as I think you

acknowledge that if there is valid basis for an eviction, they would still have the right to bring it, right?

MR. DORIA:  Absolutely.

THE COURT:  Okay.  And so what -- I'm -- as far as narrowing the scope of today's hearing, are you just seeking a ruling that this notice of immediate -- sorry, let me get the phrasing right -- notice of material and irreparable breach immediate notice to move that was issued on November 20th of 2025, is not an enforceable notice?

MR. DORIA:  There were four of those on different days, Your Honor, but yes, all of them.

THE COURT:  Okay.  Well, so I -- right now, I am only going off of what you filed, right, and so it appears relevant to the hearing now.

If you want to narrow the scope, I don't even have the other ones admitted into evidence.  I have no testimony related to it.

MR. DORIA:  I understand, Your Honor.  The way that opposing counsel is delaying the procession of the hearing, I'll never get to admit that evidence.  And so, they're focusing on a whole bunch of things that are completely irrelevant rather than being able to focus on what's relevant, which has kind of been threatened for

for times without any reason.  That's all what I want to show, Your Honor.

THE COURT:  Okay.  (Indiscernible crosstalk).

MR. DORIA:  But if she continues to ask questions for an hour and a half, we're not going to be able to do that.

THE COURT:  So hold on for a second.  Both parties get an hour.  We're set for two hours for today.  Ms. Walsh is currently sitting at 12 minutes compared to your 40 minutes, right.  You're telling me it's not in the paperwork, but actually you want to narrow the focus of today's hearings to four notices that I don't actually have that in your request.

MR. DORIA:  Can I --

THE COURT:  So it's going to be relevant because that's what you've asked for.

MR. DORIA:  I don't -- I don't -- so these notices, Your Honor, they were only intended as proof that I'm being harassed.  I only -- I only wanted protection against eviction for an illegal cause.  If they have good cause, then fine, evict me.  But --

THE COURT:  Okay.  Here's -- here's the challenge to the request because the request that you made is they can't do any eviction action.  That's how

you have it written.  Hold on.

MR. DORIA:  Can I narrow that on the record, Your Honor?

THE COURT:  Hold on.  But what I'm hearing from you is that you are saying you have defenses if they end up evicting you on notices you've currently received?

MR. DORIA:  Correct.

THE COURT:  But as we sit right now, you don't have an eviction filed against you?

MR. DORIA:  Correct, Your Honor.

THE COURT:  Okay.  So I'm confused as to why your defenses aren't being presented to an eviction because right now none exists.

MR. DORIA:  Right.  Because every week I get a threat that I'm going to get evicted.  So I need a court to tell them, "Stop threatening to evict him unless he does something wrong."  It's really simple. It is.  Is that --

THE COURT:  Yeah.  That's kind of an unenforceable court order for me to say you can't evict for any reason unless it's a valid reason because the court hasn't ruled on whether there's an eviction for a valid reason.

MR. DORIA:  It's called status quo, Your

Honor.  It's called status quo.  It's not status quo to post an eviction notice on someone's door every week to two weeks.  That is not status quo to not enforce those eviction orders and withdraw them through your lawyer, that is not status quo.  It causes fear.  It causes emotional pain, Your Honor.  And all I'm asking the court to do is say, "Stop threatening him.  If you want to evict him, evict him.  Stop sending him stop to terrorize him."  That's it.

THE COURT:  Well -- hold on a second because it's a procedural requirement that a notice go out prior to the eviction.

MR. DORIA:  I understand that, Your Honor.

THE COURT:  You are asking me to make sure they can't give you the notice that's required to do an eviction?

MR. DORIA:  Unless it's for good cause, yeah, because I've got four that they issued without good cause --

THE COURT:  Well --

MR. DORIA:  -- to terrorize me.

THE COURT:  With respect to your initial objection, the objection is overruled.  Where we sit right now, it is relevant.  So I'm going to allow the testimony.

Violation of park rules.

MS. WALSH:  Thank you, Your Honor.

Q.   (Continued by MS. WALSH:)  To your knowledge, has Mr. Doria violated park rules?

A.   Yes, having to do with the dog watching, excessive dogs, the feces, and the nuisance of that. The other thing is that everybody knows that we can only do as it is in his initial lease that we only do three-month leases, and so we have come back in to make sure everybody gets a new lease and --

MR. DORIA:  Objection, Your Honor.

THE WITNESS:  -- makes sure --

MR. DORIA:  Narrative testimony.

THE COURT:  Sustained.

MR. DORIA:  Are their violations in there somewhere?

THE COURT:  Hold on.  I just ruled on your objection.  I sustained your objection.  Now we're waiting for the next question from counsel.

MS. WALSH:  Move to strike the improper sidebar.

THE COURT:  I'm denying it.

MS. WALSH:  Okay.

Q.   (Continued by MS. WALSH:)  I'm showing you what's been admitted as Plaintiff's Exhibit 1.  It says our max

rental agreement is three months; is that correct?

A.   Yes, ma'am.

Q.   And it says you may extend your stay by notifying the office at least 30 days prior to your current agreement expiring; is that correct?

A.   Yes, ma'am.

Q.   And Mr. Doria didn't do that; is that correct?

A.   No.  He did not.

Q.   And he repeatedly refused to sign a new lease under the terms that would require compliance with park rules; is that right?

A.   Yes, ma'am.

Q.   And that --

         MR. DORIA:  Objection, Your Honor.  Now she's testifying.

         THE COURT:  Overruled.  This is cross-examination.  Leading (indiscernible crosstalk) --

         MR. DORIA:  I understand.  But I'm listening and I hear her testifying, Your Honor, so I just have to lay down the objection.

Q.   (Continued by MS. WALSH:)  Okay.  And going to Page 4 of 12 down here at the bottom it says pets, and there are no pets listed; is that correct?

A.   Yes, ma'am.

Q.   Does Mr. Doria have permanent pets living in his

RV?

A. He's told me verbally that he has two, other people have seen up to two.

Q. Okay.

A. It's in an RV, so I'm not sure.

Q. And going to Page 6 of 12, there's this handwritten note here and next to it it says DTD; is that correct?

A. Yes, ma'am.

Q. The manager's initials are not here; is that correct?

A. No, ma'am.

Q. Do you have any way of knowing if your manager agreed to this term?

A. I do not, ma'am, because she was fired.

MR. DORIA: Objection, Your Honor. She just testified that the manager signed the document.

THE COURT: No. Sir, you're trying to make a substantive and not an actual objection to evidence. Your objection is overruled.

The question was did she initial it, is there a way of knowing that she --

MR. DORIA: Is there any way of knowing that her manager signed it.

THE COURT: Right.

MR. DORIA:  Right.  And there is, there is a signature page.

MS. WALSH:  I asked if her manager approved --

MR. DORIA:  (Indiscernible crosstalk) a deceptive question, she's answering a deceptive question.

THE COURT:  No.

MR. DORIA:  Yeah.

THE COURT:  Mr. Doria, you established that the manager has signed the entire document.  The question leads to whether this modification, if there's indication that the manager knew about the modification.  So your objection is overruled.

Q.  (Continued by MS. WALSH:)  You were asked on direct exam about verbal abuse.  What were your concerns if Mr. Doria was allowed to stay based on his behavior towards you?

A.  It wasn't just towards me.  But in my experience with authoritative figure, meaning a higher level, I am the general manager of multiple parks, and I do give my title when speaking to somebody so they do know that I'm not office staff or general staff.

And in my communication with him, obviously, the conversation went very hostile.  And it's my experience

if somebody will treat you at a higher level with that type of aggressiveness, my experience would be that they would treat other staff that work for me as well as guests no better, if not worse, without that authority.

Q.   And you had mentioned he was verbally abusive to other people.  Can you tell me who that was?

A.   I just had general staff, one of them Christina Anderson works in -- that he had contact when he came into the office.  Not gender bias, but I do have --

MR. DORIA:  Objection Your Honor.

THE WITNESS:  -- office staff that --

THE COURT:  Hold on.  What's your objection?

MR. DORIA:  I just -- I didn't know throwing bigotry accusations is an appropriate form of testimony. I just want to make sure there's some objection on the record.  I've never been called a bigot before.

THE COURT:  The objection is overruled.  You can continue answering.

THE WITNESS:  I apologize.  For clarity, what I did want to say is that I had women in my office and that would separate them out to how they could take communication that was aggressive, but they had said that he was aggressive in nature.

After I had my own experience with him, I then came to a belief that, you know, he was a hostile

tenant.

Q.  (Continued by MS. WALSH:)  Would you believe that his behavior here in the courtroom is a good example of his hostile behavior?

MR. DORIA:  Objection, Your Honor. Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.

Q.  (Continued by MS. WALSH:)  You didn't make any threats to stop Mr. Doria's services, did you?

A.  Absolutely not.

Q.  You didn't threaten to turn off his water?

A.  Absolutely not.

Q.  You didn't threaten to stop collecting his garbage?

A.  No, ma'am.

Q.  You simply just asked that he sign a new lease?

A.  Yes, ma'am.

Q.  And he refused?

A.  Yes, ma'am.

MS. WALSH:  Pass the witness.

THE COURT:  So now's the time for what's called redirect if you have questions that you want to ask this witness.  It's only on what was asked in cross. You can't go to a new topic.  You may ask those

questions now.

MR. DORIA:  Understood.

REDIRECT EXAMINATION

BY MR. DORIA:

Q.  So, Ms. Pendergast, it's -- to clarify, is there any documentation that you can produce about those complaints?

Have you told me about those complaints?

A.  When I called you initially about the dog feces, because that was one of our conversation and you --

Q.  No --

A.  --  responded that you would go out and, you know, pick the stuff up.  So we did have a conversation which came from a complaint.

Q.  Okay.  So none of this is in writing, these complaints from employees, the aggressive behaviors, there was nothing in writing before November 20th; is that right?

A.  Maybe other witnesses including --

Q.  Not --

A.  -- (indiscernible crosstalk) --

Q.  -- you are aware of?

A.  Yes.  I am aware that somebody did serve a notice (indiscernible crosstalk) --

Q.  Before November 20th?

A.   Yes, sir.

Q.   Okay.  What notice was that?

A.   I believe it was a notice on picking up the feces and giving you a written notice at your RV.

Q.   Okay.  So to confirm, the only written notice that the park has given me in my eight-month tenure there is could you please pick up dog poop; is that correct?

A.   Yes.

MR. DORIA:  Thank you.  I don't have any further questions, Your Honor.

THE COURT:  Ma'am, you may step down.

Mr. Doria, are you going to be your next witness?

MR. DORIA:  I'm going to try, Your Honor.

THE COURT:  Okay.  We're going to get you sworn in.  Because you are acting as your attorney, you can stay at counsel table.  That will allow to you utilize the exhibit portal.  Let's get you sworn in.

MR. DORIA:  Okay.

THE COURT:  If you could please stand and raise your right hand for the clerk.

THE CLERK:  Do you solemnly swear or affirm upon the penalty of perjury the testimony you are about to give will be the truth, the whole truth, and nothing

but the truth so help you God?

MR. DORIA:  I do.

THE COURT:  All right.  Please be seated.

MR. DORIA:  Okay.  Your Honor, I'd like to identify Plaintiff's Exhibit 2.

THE COURT:  All right.  I just need you speaking into the microphone.  If you need to (indiscernible) that's fine, it's just they're directional.

MR. DORIA:  I would like to identify Plaintiff's Exhibit 2.  It's an email from Cottonwood Springs RV to all tenants on September 24th, 2025.  It's an original email.  It has not been edited by me and it was written by Cottonwood Springs RV management, sent from storage@cottonwoodspringsRV.com.

THE COURT:  Are you seeking the admission of plaintiff's Exhibit 2?

MR. DORIA:  I am, Your Honor.

THE COURT:  All right.  Ms. Walsh, any objection?

MS. WALSH:  No objection.

THE COURT:  Plaintiff's Exhibit 2 is admitted.

MR. DORIA:  This -- this communication was the first notice that was given to the entire park that

they would be terminating leases, that includes leases where people have lived there for more than 6 months.

Your Honor, I'd like to admit Plaintiff's Exhibit 3.  This is an email from me in response to the defendant September 24th at 5:41 p.m.  It's the original email.  It hasn't been edited by me or anyone else to my knowledge and it explained my legal rights and protections under the Arizona RV Long-Term Rental Space Act and this triggered presumption of retaliation.

THE COURT:  You are seeking the admission of Plaintiff's Exhibit 3?

MR. DORIA:  I am, Your Honor.

THE COURT:  Ms. Walsh, any objection?

MS. WALSH:  I would object to hearsay, Your Honor.

MR. DORIA:  This is an email from me, a direct response to the notice that they were giving everyone to vacate, Your Honor.  This is called assertion of rights.  The email is original.

THE COURT:  Hold on.  The objection is overruled.  Plaintiff's Exhibit 3 is admitted.

MR. DORIA:  I'd like to admit Plaintiff's No. 4 Your Honor.  This is the Defendant's response to assertion of rights dated September 25th.  It's unedited, original email from Marina Hankins at the

time.  This is the second threat of eviction.  The final line states without background check and new lease with deposit, you will go back to full rate as of November 1st and be asked to leave.

THE COURT:  It is not admitted into evidence.  You can't --

MR. DORIA:  Oh, I apologize.

THE COURT:  -- read from it yet.

MR. DORIA:  I apologize Your Honor.  I would like to admit this as Plaintiff's 4.

THE COURT:  Any objection, Ms. Walsh?

MS. WALSH:  No objection.

THE COURT:  Plaintiff's Exhibit 4 is admitted.

MR. DORIA:  The final line in that email is the second threat of eviction without cause.

I'd like to admit Plaintiff's No. 6, Your Honor.  This is a notice to vacate dated November 25th, signed by nobody, alleged to have been handed to me directly.  Also citing -- I won't get into that detail.  This is an unedited original notice to vacate provided by the property via email, Your Honor, on November 25th.  I'd like to admit this as Plaintiff 6.

THE COURT:  Ms. Walsh, any objection?

MS. WALSH:  No objection.

THE COURT:  Plaintiff's Exhibit 6 is admitted.

MR. DORIA:  I'd like to exhi- -- admit Plaintiff's No. 7.  This is a notice of termination of periodic tendency dated December 9th, signed by Julie Martin.  It's an original document, unedited.  I'd like to admit this as Plaintiff's 7.

THE COURT:  Any objection, Ms. Walsh?

MS. WALSH:  No objection.

THE COURT:  Plaintiff's Exhibit 7 is admitted.

MR. DORIA:  This -- Ms. Pendergast never knew that Marina Hankins allowed me to babysit dogs. And when she found that out, and she admitted it under oath, Your Honor, that I need to leave because I want to continue to babysit dogs.  And that's the only reason.

The verbal accosting, the allegations and the things that I admitted to saying, Your Honor, those all started after November 20th when I was put under economic duress and threatened multiple times just because she found out that her manager signed a lease that she wished she hadn't signed.

I'd like to admit Plaintiff's No. 8, Your Honor.  This is an email from opposing counsel dated December 18th.

MS. WALSH:  I object -- excuse me.

MR. DORIA:  This is not a Rule 408 communication, Your Honor.  There's -- I'm not sure what the objection is.

THE COURT:  He is still laying foundation, so it's premature to object.

MS. WALSH:  Withdrawn.

MR. DORIA:  Dated December 18th.  It's an unedited version.  It was directed from Brittany Walsh to myself.  I'd like to admit it as Plaintiff's No. 8.

THE COURT:  Ms. Walsh?

MS. WALSH:  I would object to both relevance and impermissible hearsay.  There are statements by the party Mr. Doria in this email.  It is an email from him to which I replied.  First of all, there's no relevance to the hearing today and there's out-of-court statements by Mr. Doria used to prove the truth of the matter therein and there are no exceptions to the hearsay rule that allow him to introduce his own statements.

THE COURT:  So let me make sure I'm understanding, Ms. Walsh.  With respect to the Page 1 of 2, and I'm not quite sure if Page 1 of 2 is only your communication or if it also includes communication from Mr. Doria.

MS. WALSH:  Yeah.  Page 2 is the hearsay

objection, Page 1 -- as well as relevance, and Page 1 is relevance objection.

THE COURT:  Okay.  Mr. Doria, I'll allow you to argue that objection.

MR. DORIA:  Your Honor, the most important document for admission is Page 1 of this exhibit where opposing counsel admits that they cited the wrong law and withdrew their notices to vacate.  That's the only reason I've admitted it.  Who issues sworn notices to vacate and then says, "Take that back, we messed up.  Mistake."  So that's why she didn't want that admitted.

MS. WALSH:  I would object and move to strike to the testimony about what's in this document.  This document will speak for itself, if and when it is allowed to be admitted.

MR. DORIA:  Agreed.

MS. WALSH:  So I would move to strike to that testimony as he is testifying about what's in this document.

THE COURT:  Okay.  So here's what we're going to do.  I am granting the motion to strike.  I am only admitting Page 1 and not Page 2 of Plaintiff's Exhibit No. 8.

MR. DORIA:  Understood.  Thank you, Your Honor.

I'd like to admit Plaintiff's No. 9, an email dated December 22nd directed to Brittany Walsh titled Rule 408 Settlement Communication Offer to Cure and Coordinate Payment, Doria versus Cottonwood Springs. It's an unedited email from me to Walsh. I would like to admit that as Plaintiff's 9.

THE COURT: Ms. Walsh?

MS. WALSH: I'd object. First of all, this is a Rule 408 communication, it's not permitted for these purposes, as well as it is it an out-of-court statement used to prove the truth of the matter therein and therefore it is hearsay with no exceptions barred by Rule 801.

THE COURT: The objection is sustained. Plaintiff's Exhibit 9 is not admitted.

MR. DORIA: I -- I'm still testifying, correct, Your Honor?

THE COURT: You are.

MR. DORIA: The offer to sign a new lease with Julie Pendergast took place on that initial phone call. I've been offering to sign a new lease and do a background check since they asked to do it.

The only reason that they want me out is because they don't want a lease on file that allows somebody to babysit dogs. Julie took personal offense

to the fact that that had slipped through the cracks. So while the other party would have the court believe that at maybe at some point down the road I offered, or whatever the case may be, Your Honor, there has been an offer to sign a new lease with that pet provision from day one and they -- they're the ones that have been rejecting that offer because they don't want a dog babysit- -- which is fine if they don't want a dog babysitter, that's fine. But you got to pay for that if you're going to kick someone out. You can't just push them around. Sorry. (Indiscernible) anyways.

Your Honor, I'd like to admit Plaintiff's No. 10. This is a Rule 1006 summary of voluminous evidence it's related to Plaintiff's No. 11 where -- sorry, related to Plaintiff's No. 16. No. 16 is medical evidence that's too voluminous to show -- to discuss on the record and review immediately, Your Honor.

So the Rule 1006 summary just highlights and summarizes the imminent harm that would be sustained should I be forced to change houses again. I would like to, Your Honor, admit Plaintiff's No. 10, all pages of the summary. This was created by me and it was use -- and I used the medical evidence from -- that was provided to me by the SSA to create this summary for the court.

THE COURT:  So I want to make sure --

MR. DORIA:  Sure.

THE COURT:  -- I'm understanding.  Are you asking for 16 also to -- Plaintiff's 16 also to be admitted or only Plaintiff's 10?

MR. DORIA:  I believe -- I believe Plaintiff's 10 and 16, Your Honor.  The 10 was created to summarize No. 16 because it wasn't expected to be able to review all of these documents today.  This is a like a 700-page medical document.

THE COURT:  Right.  Ms. Walsh, any objection?

MS. WALSH:  Yes, Your Honor.  Relevance as well as I believe 403.  This is more prejudicial than probative.  There are no allegations about his disability or Defendant's targeting him based on his disability, and so his medical records are certainly not relevant.

MR. DORIA:  Actually, no mention has been made of my disability until it was shared with counsel.  But this is for imminent harm, Your Honor, it's clearly imminent harm.

THE COURT:  Hold on.  I have a follow up question for you, Mr. Doria.

With respect to Plaintiff's Exhibit 10 and

Plaintiff's Exhibit 16, it seems like this is sensitive personal information.  And so, are there items in there that you would like restricted from public view?

MR. DORIA:  No, Your Honor.

THE COURT:  Does --

MR. DORIA:  I understand.  No, Your Honor.

THE COURT:  Okay.  All right.  The objection is overruled.  Plaintiff's Exhibit 10 and 16 are admitted.

MR. DORIA:  Real quick while we're here, Plaintiff's 17 is also medical records.  They're just more updated.  These are produced by Spectrum Healthcare.  They're progress notes from my biweekly therapy treatment and they discuss my medication.

These -- I believe the 700-page document is about the five years.  This is, like, the last year, Your Honor.  These are also -- this information is included with that Rule 1006 summary.  I don't know if the court -- you know -- can I admit Plaintiff's No. 17, Your Honor, along with Plaintiff's No. 16?

THE COURT:  We already admitted 16.

Ms. Walsh, any objection to Plaintiff's Exhibit 17?

MS. WALSH:  Same objection, relevance.

THE COURT:  The objection is overruled.

Plaintiff's 17 is admitted.

And, Mr. Doria, you have five minutes remaining and you may want to reserve that for your redirect.  I'm just giving you fair warning on your time.

MR. DORIA:  No further questions, Your Honor.

THE COURT:  Are you ready for questions on cross-examination?

MR. DORIA:  Yes.

THE COURT:  Okay.  Ms. Walsh?

MS. WALSH:  Yes.

THE COURT:  And we need to switch the control over.

THE BAILIFF:  All right.

CROSS-EXAMINATION

BY MS. WALSH:

Q.  Mr. Doria -- may I proceed?

THE COURT:  Yes.

Q.  (Continued by MS. WALSH:)  Mr. Doria, you would agree with me that your leash ended on June 9th, 2025; is that correct?

A.  Not according to Paragraph 2 of the lease, no.

Q.  Well, your lease ended and then you went month to month; is that correct?

A.   Can we -- when you say lease ended, can you -- what do you mean by lease ended?

Q.   Your lease term ended -- here, let me show you.

A.   Okay.

Q.   So I am pulling up Plaintiff's Exhibit 1 and I am headed to page, I believe, 4 of 12.  And here at term it says the term of this agreement shall commence on the date written above in Paragraph 1 effective date and end on 9th day of June, 2025.

     Did I read that correctly?

A.   No.  You missed the unless terminated.  It's a --

Q.   Well, that's the next sentence.

A.   Yeah.

Q.   I read that first sentence correctly, right?

A.   No.  That would mislead the court when you are --

     THE COURT:  Hold on.  Hold on.

     THE WITNESS:  -- reading in part.

     THE COURT:  Hold on.  So right now on cross -- so the thing you were complaining about is what you are doing, right.  You just need to answer the question that's asked because you're going to get a chance to provide clarifying testimony.

     If you need to write down the things that you want to circle back to and provide me with additional information, you can do that.  So, for

example, did she read it correctly, yes or no.  You don't need to go into whether it is misleading, you have redirect to bring my attention to if you believe it is misleading.

MR. DORIA:  I understand what you are saying, Your Honor, but I'm under oath and so I can't mislead the court.  If someone else in the room wants to mislead the court, they can do that.

THE COURT:  Well --

THE WITNESS:  I'm just not permitted to do that.

THE COURT:  I'm just telling you to answer the question that's asked.

MR. DORIA:  Under oath.

THE COURT:  Yes (indiscernible crosstalk) --

MR. DORIA:  I have to answer under oath.

THE COURT:  -- being asked the question that's asked.

MR. DORIA:  Under oath, though.  I have to answer.  I'm still under oath, correct?

THE COURT:  Sure.

MR. DORIA:  Okay.

Q.  (Continued by MS. WALSH:)  Mr. Doria -- may I proceed?

THE COURT:  Yes.

Q.   (Continued by MS. WALSH:)   Mr. Doria, what did I miss in that first sentence?

A.   Unless terminated by either party after the expiration of the initial term --

Q.   Is it your testimony that's in the first sentence?

A.   The first sentence, no.   That's the second sentence.

Q.   And so you agree with me that your effective ending date of your lease was June 9th?

A.   Can you define effective end date for me?

Q.   Can you answer the question?

A.   Can you define the effective end date?   It's a very simple question.   She's the lawyer.

THE COURT:   Hold on.   You can just say I can't answer or I don't know, right.   But it's your turn (indiscernible crosstalk) --

MR. DORIA:   Can I ask for clarity?

THE COURT:   -- and she may not provide it and then you can say you don't know --

MR. DORIA:   Okay.

THE COURT:   -- or you can't answer.

Q.   (Continued by MS. WALSH:)   Did I read that incorrectly?

A.   Yes.

Q.   Okay.  And -- you were on a month-to-month lease; is that correct?

A.   When you say on a month-to-month lease, can you explain what that means to be on a month-to-month lease at Cottonwood Springs RV?  Because I'm not sure if I was on a month-to-month lease or not based off of what you are saying.

Q.   So is it your testimony you were unaware that your lease was month to month?

A.   That I was unaware that my lease -- can you explain what you mean by the month being -- the lease being month to month?  That's where the conflict is.

Q.   So month to month is where your lease ends at the end of every month and if your landlord accepts rent it renews every month.

A.   Oh.  Then yeah, I was on a month-to-month lease.

Q.   And you were aware of that as you have expressed so much to Cottonwood Springs; is that correct?

A.   That I was still on a lease?

Q.   That you were on a month-to-month lease?

A.   That's correct.

Q.   Okay.  And, as you sit here today, you have not signed a new lease; is that correct?

A.   That's correct.

Q.   Okay.  And on September 24th, you received an

email from Defendant notifying you that they needed a new lease agreement; is that correct?

A.  I don't recall.  Did you say September 24th or December 24th?

Q.  September.

A.  That one I recall, yeah.

Q.  That's a yes to my question?

And I have it here pulled up for you if you like to refresh your recollection.

A.  That's the wrong one.

THE COURT:  (Indiscernible crosstalk) Plaintiff's --

Q.  (Continued by MS. WALSH:)  This is Plaintiff's Exhibit 3.

A.  What's your question?

Q.  You were asked for a new lease by the management; is that correct?

A.  Numerous times.

Q.  And, as you sit here today, you haven't filled out a new application, have you?

A.  Without -- I've applied to be able to live there with babysitting dogs, not without.

Q.  Okay.  So you haven't allowed a background check?

A.  Oh.  Yes, I have.  It's in the lease.  You guys can do a background check before or after the lease

expires.  I signed that document.  It's Plaintiff's 1, background check is permitted before or after the lease expiration.

Q.  Okay.

A.  I've always been willing to sign a lease.  I've never been willing to give up my dogs.  That's the conflict.

Q.  And it's your testimony that your landlord has to accept a lease based on your terms?

A.  Based off of the terms they already signed for. They can't -- they can't cross out a term and say, "Look, I know we signed saying that you could babysit dogs.  But on the new lease we're saying you can't babysit dogs."  That's terminating a lease without cause or the cause that you don't want dogs on the property any more, but you can't do that.  Just because it's month to month, yeah, you can't just go back and say, "All those rules that we laid down for you, they disappear now."  You can't just kick someone out and say you can't make a living (indiscernible crosstalk).

Q.  Sir, there's no question pending.

A.  What's your question?  Do you know?

Q.  Defendant never threatened to stop your electric service, did they?

A.  Yes.

Q.   Did -- when?

A.   The day they threatened, they said that I had to leave and give back keys.

Q.   Did they threaten to stop your electric service --

A.   Yes.

Q.   -- before you were terminated?

A.   They threatened to stop my electric service on November 23rd, November 24th -- 23rd -- November 25th and December 9th, ma'am.

Q.   And that's not in any writing that you've shown this court here today; is that right?

A.   Yes, it is.  Did you forget the exhibits that we've been looking at?

Q.   So it's your testimony that --

A.   You guys are going to leave the water on --

Q.   Sir, there is no question pending.

THE COURT:  Hold on.  This is not appropriate.  Give another question and then answer it.

Q.   (Continued by MS. WALSH:)  So it is your testimony that the eviction notice is the threat to stop your electric service; is that correct?

A.   100 percent.

Q.   Okay.  But they never said, "We're going to stop your electric service unless you leave"?

A.   Can you -- can you -- I'm going to have to run a search through my databases to see if that verbatim statement exists anywhere.  What was the verbatim statement, please?

Q.   Defendant never said, "We will stop your electric service unless you leave," is that correct?

A.   I will have to check my records.

Q.   And before you filed this case, you never made any reports to a governmental agency about building violations, right?

A.   No.

Q.   About park violations?

A.   No.

Q.   Never attempted to unionize?

A.   No.

Q.   Okay.  And --

A.   You got me confused with somebody that also doesn't like your client.

Q.   You --

A.   I'm sorry, that was inappropriate, Your Honor.  I apologize.

Q.   Okay.  I am pulling up Exhibit 6.

This is the -- I believe it is dated November 25th, 20- -- Plaintiff Exhibit 6.  You disclosed this, so you admit that you received this

document; is that correct?

A.   Correct.

Q.   Okay.  Pulling up Plaintiff's Exhibit 7, this was issued on December 9th.  You were personally handed this document; is that correct?

A.   I don't recall.

Q.   Okay.  You've demanded --

A.   I'm in position of it.  I don't know if it was handed to me, but I'm in possession of it.

Q.   Okay.  And going back to -- excuse me, staying on Plaintiff's Exhibit 6, it says here we accept your lease termination notice dated November 25th, 2025; is that correct?

A.   Yep.

Q.   And you haven't rescinded your lease termination with defendants, have you?

A.   Yes, I have.

Q.   And have they accepted that?

A.   No.  But it was given under economic duress.

MS. WALSH:  Move to strike.  There's no question pending.

THE COURT:  I'm granting that.  You need to wait for another question.  That is what redirect is for, Mr. Doria.  If you have clarifying information based on what you are asked in cross, that's what you go

over in redirect.

Q. (Continued by MS. WALSH:) You've testified that you had threats to your safety. The threats to your safety was being evicted; is that correct?

A. The threats to my safety you couldn't possibly fathom. You don't obviously understand I have conditions. You don't --

Q. Is that a yes or no, sir?

A. What was the question? Is eviction a safety hazard?

Q. The threat to your safety was eviction; is that correct?

A. They were indirect results of eviction.

Q. And you have said they have harassed you. The harassment was based on their eviction notices, correct?

A. Correct.

Q. And their terrorization of you, that was also based on the eviction notices; is that correct?

A. That's correct.

Q. Okay. And you agree you reiterated --

A. The ones you withdraw.

Q. Sir. There is no question pending. I move to strike.

A. Sorry. I was clarifying.

          THE COURT: Granted.

Q.   (Continued by MS. WALSH:)  You reiterated you would move out on November -- January 9th, 2025, in an email; is that correct?

A.   Which email are you referring to?

Q.   I'm pulling up Defendant's Exhibit 18, Defendant's Exhibit 18.  This is your email address; is that correct?

A.   Yes.

Q.   And it says my move-out date is January 9th account, 2026; is that correct?

A.   That's correct.

MS. WALSH:  No further questions.

THE COURT:  All right.  Mr. Doria, you have five minutes for doing the redirect.  So if you have clarifying information you want to give me based on what was asked, you can do that.

MR. DORIA:  I haven't voluntarily moved out of a home in the last five years, Your Honor.  The Defendant's counsel is leading this court to believe that I volunteered to move out of this home.

The fact of the matter is that they told me that I must leave immediately for being a jerk on November 20th and then I told them that I would.  Then I started seeking protection from the court and I said I'm not.

It was done under economic duress.  The court has the exhibits proving that these guys told me, "We're going to evict you for this reason or that reason or that reason.  We're going to give you this document and that document."  I had to do something, so I sought protection from the court and I started to plan to move if that was the last resort.

And I did, I coordinated a move out for January 9th.  That doesn't mean that I don't have rights under the Arizona RV LONG-TERM Rental Space Act, Your Honor.  So again the court -- they would lead the court to believe that the move out is voluntary.  It 100 economic duress.  I've got school, I am a full-time stu- -- I don't have time to be moving every six months, Your Honor.

It's -- the idea that I would voluntarily vacate my stable home is absolutely nonsense and unsupported by any documentation that they provided here today, Your Honor.  That's all I've got.

THE COURT:  All right.  Mr. Doria, you only have three minutes left, so I'm thinking that you don't have another witness; is that correct?

MR. DORIA:  That is correct.

THE COURT:  All right.  Ms. Walsh, do you have any additional witnesses?

MS. WALSH:  Yes, Your Honor.  I have one witness.  I would like to call Julie Martin.

And, David, if you could have Christine Anderson come in, I'm not going to call her here today.  And, Your Honor, if I could get a time check.

THE COURT:  You are at 32.

MS. WALSH:  And I have an hour total?

THE COURT:  Yes.

MS. WALSH:  Thank you.

THE COURT:  But keep in mind one of the issues is Mr. Doria has a right to do some cross-examination although limited because he has limited time left.  So just please keep that in mind.

THE BAILIFF:  Face the clerk and raise your right hand.

THE CLERK:  Do you solemnly swear or affirm upon penalty of perjury the testimony you are about to give will be the truth, the whole truth, and nothing but the truth so help you God?

THE WITNESS:  I do.

THE BAILIFF:  All right.  Come on up, please.  Have a seat make sure you stay (indiscernible).

THE WITNESS:  Okay.

THE BAILIFF:  If you need to make the mic (indiscernible).

THE WITNESS:  Okay.

THE COURT:  Go ahead, Ms. Walsh.

MS. WALSH:  Okay.

DIRECT EXAMINATION

By MS. WALSH:

Q.   Ms. Martin, please state your name for record?

A.   Julie Ann Martin.

Q.   What is your position with Happy Jack Lodge?

A.   I am one of the property managers at Cottonwood Springs and then I'm also the restaurant manager at the lodge during the season.

Q.   Okay.  And what involvement did you have with getting background checks with the residents around September of 2025?

A.   I just follow up with them when they turn in the application and then we submit them to the background company online.

Q.   Okay.  On November 25th, 2025, you served Mr. Doria a notice.  Would you recognize that if I showed it to you?

A.   Yes.

Q.   It is pulled up on your screen.  Does that look familiar?

A.   If you can scroll down for a second so I can see the bottom?

Q.   Yes, ma'am.

A.   Yes.

Q.   And is that the notice that you served on Mr. Doria?

A.   Correct.  Yes.

Q.   And how did you serve that on Mr. Doria?

A.   I gave it directly to him.

Q.   Okay.

THE COURT:  Hang on a second.  What exhibit --

MS. WALSH:  I'm so sorry.  Plaintiff's Exhibit 6.

THE COURT:  Okay.

Q.   (Continued by MS. WALSH:)  And pulling up Exhibit 7, this was served on December 9th, this has been admitted already, and down here it says your name?

A.   Correct.

Q.   And 12/10/25, did you also serve this on Mr. Doria?

A.   I served it to his trailer, yes.

Q.   And when you say that, what do you mean?  How did you serve him?

A.   I posted it on his door.

Q.   Okay.  To your knowledge, what prompted these notices?

A.   To my knowledge is that he already said he was terminating his leases, so this was just a rebuttal to his email on him vacating the property and with his last night being January 9th, 2026.

Q.   And to be clear for the record, by rebuttal you mean you were agreeing to his move-out date?

A.   Correct.

Q.   Okay.  To your knowledge, has Mr. Doria executed a new lease?

A.   Not to my knowledge.

Q.   And, to your knowledge, has he agreed to a background check?

A.   He has not agreed.  He had an email that we had that said he was not going to do a background check.

Q.   It's your testimony that he has refused a background check?

A.   Correct.

        MS. WALSH:  Okay.  Pass the witness.

        THE COURT:  Cross-Examination?  Questions for this witness, Mr. Doria?

        MR. DORIA:  I can't introduce exhibits on cross, can I, Your Honor?

        THE COURT:  You can.

        MR. DORIA:  Oh.

        THE COURT:  You have limited time though,

Mr. Doria.

MR. DORIA:  You know, because of the briefness of the hearing, I probably don't have time to get to where I need to get to today.  But for future proceedings, I want to confirm -- I'm losing my train of thought.  How much time do I have, Your Honor?

THE COURT:  Two minutes.

CROSS-EXAMINATION

BY MR. DORIA:

Q.  So, to your knowledge, I'm being asked to leave not for violations, but because I offered to leave on January 9th?

A.  I have no idea.  What was the question?

Q.  So it's your understanding that I volunteered to leave January 9th and it's your -- well, I'll let you answer that question.  Go ahead.

A.  Well, I read an email that you sent saying that your last night is January 9th.

Q.  And it's your understanding and your belief that that was voluntary and not done under duress?

A.  I have no knowledge of what that was.

MR. DORIA:  Okay.  Fair enough.

I think that's all the questions that I have, Your Honor.  Thank you.

THE COURT:  Fair enough.  Redirect?

MS. WALSH:  No redirect.  We ask this witness to step down.

THE COURT:  All right, ma'am.  You may step down.

THE WITNESS:  Thank you.

THE COURT:  All right.  Any additional witnesses, Ms. Walsh?

MS. WALSH:  None.

THE COURT:  Okay.  Mr. Doria, would you like to make a closing?

MR. DORIA:  No.  I think I'm all set, Your Honor.

THE COURT:  Ms. Walsh, would you like to make a closing?

MS. WALSH:  Yes, Your Honor.

We sit here today on Plaintiff's motion for an injunction and request that this court stop my clients from moving to evict him.  And, quite frankly, Your Honor, the relief he seeks is impermissible and way too broad.

Now, a month-to-month tenancy under the RV Act, there is no case law describing what the court can do in an holdover tenancy.  And so, I'm asking this court to root itself, to ground itself, in the persuasive authority of what the Landlord-Tenant Act

provides for us.  And the Landlord-Tenant Act provides that a landlord can -- if a tenant remains in possession without the landlord's consent they can terminate at any time, no good cause needed.

This is the -- this is language from the Second Restatement as adopted by ARS 33-2147, Pima County versus Tustin affirms this, that a landlord can discontinue a holdover tenancy at any time.

This is what Mr. Doria had here and he makes several arguments.  He claims that he was threatened.  He claimed that he was harassed.  He claims that he was under economic duress.  Your Honor, all of those arguments are simply that my clients were moving to evict him because he refused to sign a new lease under terms that would have him -- that would have Plaintiff abide by park rules.

He refused a background check.  He refused a new lease unless my clients provided a lease under his terms.  And unfortunately for Plaintiff, that's just not how the law works.  But the court doesn't need to go that far because Mr. Doria, in writing stated, that he would be out by January 9th and my clients have accepted that.  And at no time have they entered into a new agreement with Mr. Doria.

He said he was going to leave.  They're

relying on that. And the court can make its decision that a preliminary injunction stopping my clients from evicting him when he inevitably isn't going to be out on January 10th is too broad and not rooted in the facts here before us.

Mr. Doria wants this court to believe that they needed good faith. But again, he had a holdover tenancy and that is not how the law works. And it is against public policy and, quite frankly, a wild assertion that tenants under the RV Act have more rights than tenants under the Landlord-Tenant Act.

And, Your Honor, threats to his safety, he claims he will be homeless, he lives in an RV. He can pick up his RV and go elsewhere which is what he's been asked to do because he's been verbally abusive. He's refused to pick up his site after his dogs. He's done so much to create impetus for my clients to ask him to leave and they did. And he agreed that he would. And it's unclear why we sit here today because we have a writing that this court has seen where he says I will leave by January 9th.

There is no duress. There is no wrongful threat by my clients because if this court were to rule that there was economic duress than what this court would be ruling is that a threat to evict someone is a

trigger for duress and that would create a whole mess of law under the Landlord-Tenant Act that I don't believe is upheld in the case law.

They only asked for a lease that complies with their park lease. They merely asked for a background check, and Mr. Doria refused and because he refused, he said, "Okay, I'll move out," and we're asking the court to deny him his injunctive relief. Thank you.

THE COURT: All right. I will -- I'm taking this matter under advisement. I have a lot of exhibits that I need to read that were referenced, but the contents I didn't have an opportunity to look at.

I will be frank with the parties about my concern in this case which is the broadness of the request submitted by Mr. Doria, possibly verbally modified today at the hearing, but also I need to go back and I need to listen to that section of today.

I want to temper your expectations. I'm in trial for the next two days. And because of that, you're unlikely to see my under advisement ruling prior to the New Year. I will do my best to try to get it out before the end of the week, but I can't provide any guarantees.

All right. That will conclude our hearing

for today.  We're adjourned.

                MS. WALSH:  Thank you, Your Honor.

                THE BAILIFF:  All rise.


(The recording concludes at FTR Timer 4:32:10 p.m.)

113

STATE OF ARIZONA      )
                      )
COUNTY OF YAVAPAI      )


          BE IT KNOWN that the foregoing transcript was transcribed from a digital recording by Ashlee Mangum, Certified Reporter # 50612, for the State of Arizona; that I was the preparer of this transcript, but was not present in person at the proceedings.  The above-mentioned Court Reporter does not certify that the digital recording itself is accurate or complete.  Where the recording was unintelligible, inaudible, or garbled, the parenthetical "indiscernible" was inserted.

          I CERTIFY that the foregoing pages are a true and correct transcript of the digital recording, all done to the best of my skill and ability.

          I FURTHER CERTIFY that I am in no way related to nor employed by any of the parties hereto, nor am I in any way interested in the outcome of the proceedings.

          DATED at Prescott, Arizona, 30th day of April, 2026.




_____
ASHLEE MANGUM, RPR
Registered Professional Reporter
Certified Reporter # 50612